## SECURITIES & EXCHANGE COMMISSION v. W. J. HOWEY CO. et al.

### No. 11421.

Circuit Court of Appeals, Fifth Circuit.

Nov. 13, 1945.

William A. McClain, Atty., Securities and Exchange Commission, of Atlanta, Ga., and Roger S. Foster, Solicitor, Securities and Exchange Commission, Milton V. Freeman, Asst. Solicitor, Securities and Exchange Commission, and Alexander Cohen, Atty., Securities and Exchange Commission, all of Philadelphia, Pa., for appellant.

George C. Bedell, of Jacksonville, Fla., and C. E. Duncan, of Tavares, Fla., for appellee.

Before HUTCHESON, WALLER, and LEE, Circuit Judges.

HUTCHESON, Circuit Judge.

The suit against W. J. Howey Company [1] and Howey-In-The-Hills Service, Inc.[2] was for an injunction under Section 20(b) of the Securities Act of 1933.[3] The claim in general was that the defendants, without filing with the Securities and Exchange Commission a registration statement with respect thereto, have been, and are now, using the mails and interstate commerce to sell securities, to-wit, investment contracts,[4] evidenced by warranty deeds and development contracts given in connection with, and as a part of, the sale of citrus groves in violation of Section 5(a), Securities Act of 1933, Sec. 77e(a), 15 U.S.C.A.

Particularized, the claim was: that the two companies under the same common control, with the same officers, facilities, and personnel, and substantially the same stockholders, were engaged in carrying on an investment business, to-wit, the growth and cultivation of citrus trees and the marketing and sale of fruit therefrom; that by the device of deeds from the Howey Company to the groves, and cultivation and management contracts from the Service Company, they were in substance and effect selling investment contracts to customers in that, though the purchasers of groves paid their money in form as purchasers of specific tracts of land, they were in fact investors with the Howey Companies in a citrus growing and marketing enterprise, the profits from their purchases to be derived not from their own skill and efforts but from the skill and efforts of others.

The defendants denied the charges of the complaint that they were jointly selling investment contracts. As to the Howey Company, they insist that it was selling specific groves and executing deeds carrying full title to them, that its contract was complete when the terms of sale were agreed on, and the sale was complete when the deed was delivered. As to the Service Company, the insistence was that it was engaged not in selling securities or investment contracts but in selling its services in caring for, cultivating and managing groves. Finally, pointing out that there was no requirement on the part of the Howey Company that its purchasers would have their groves served by the Service Company, and no obligation on the part of such purchasers to have this done, they insisted that it could not reasonably be claimed that a purchaser of a grove from the Howey Company was not purchasing merely a grove and looking to its growth and fruiting for a return on, and an increase in, value of his investment, but was in reality purchasing an interest in an investment enterprise being carried on by the two Howey Companies, looking to their work and efforts for a return on his investment and an increase in its value.

The district judge, upon facts [5] stipulated and testified to without conflict, found with

---

[1] This company is the owner of large tracts of land in Lake County, Florida. For more than 20 years it has been planting citrus trees and, after the trees have reached one year or older, selling to various purchasers various size groves at various stages of development, the price varying according to the number of years the land has been planted to citrus trees. It also owns and operates the Floridan Country Club at Howey-In-The-Hills, a resort hotel frequented by tourists and vacationists. These are shown citrus groves owned by the company, are informed that young groves are for sale, and, if any interest is shown, this is followed up with an effort to make sales.

[2] This company has since its organization in 1932 been engaged in cultivating and developing citrus groves for their owners, generally under a standard form of service contract used by it since 1935, with occasional modifications to suit particular requirements of particular owners.

[3] 15 U.S.C.A. § 77t(b).

[4] "The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, pre-organization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." Sec. 2(1), Securities Act 1933, 15 U.S.C.A. § 77b(1).

[5] The citrus industry is an established industry in central and southern Florida. Its beginning antedates the building of railroads into the state, and its progress has been such that it is the largest single farming industry in the State. According to United States Census of 1940 there were 1721 farms reporting two acres or more of citrus trees in Lake County, with more than one million trees of bearing age. It is a matter of common knowledge in the

the defendants that they were not, as charged, selling securities, to-wit, invest-ment contracts, but that the Howey Company was selling groves, and the Service

citrus section of Florida, and the record discloses, that the care of citrus groves requires equipment and a force beyond the means of the owner of a small tract of citrus property and there are numerous companies of good standing in the State, whose business is to service groves owned by others. There are at least seven such companies operating in the area in which the Service Company operates.

The prices charged for the land, which vary according to the number of years it has been planted with citrus trees, are as follows:

One year old trees $675 per acre;

Two year old trees $750 per acre;

Bearing trees (five years old or older) approximately $1,000 per acre.

Upon full payment of the purchase price the land is conveyed to the purchaser by warranty deed. If the purchaser fails to pay the installments required by the Contract, the Howey Company may foreclose the contract in the same manner as it would foreclose a mortgage under Florida laws.

All sales have been an out-right sale of a definitely identified tract of land. In no instance has there been a sale of a right to share with others in the profits of land held in common with the defendant Companies or others.

No sales have been made by the Howey Company to any purchaser who has not personally inspected the property. In numerous instances the purchasers have acquired homes in the vicinity or spend a portion of each year in the vicinity, frequently inquiring and making suggestions with respect to care of their land and marketing of the fruit. The standard service agreement provides that the development of the property and the harvesting and sale of the crop shall be done in accordance with the best judgment of the Service Company. A considerable number of the purchasers visit their property at least once a year.

The Howey Company sells acreage to persons who do not use the Service Company as their caretaker. The Service Company services trees on land not purchased from the Howey Company and solicits service contracts from others than purchasers of the Howey Company. Sales of acreage by the Howey Company are not conditioned upon the purchasers entering into service agreements with the Service Company, and the caretaking agreements are not conditioned upon the purchase of acreage from the Howey Company. Prospective customers have an opportunity to learn that there are numerous competing service companies of high standing operat-ing in the vicinity of Howey-In-The-Hills whose business is to service property owned by others. Such competitors post signs by the land serviced by them which are visible from the highways, and they send advertisements to land owners. Moreover, officers of the Howey Company and the Service Company acquaint prospective purchasers with the existence of competitors. Of course, prospective customers are informed by them that the Service Company's competency and efficiency exceed that of its competitors.

The defendant Service Company was servicing 2,487.36 acres of citrus groves in March, 1944, including therein 166.40 acres purchased from Howey Company since 1941, and maintains 75 tractors, sprayer wagons, fertilizer trucks, and other machinery used in cultivating these citrus groves, a machine shop and force of mechanics. The company also maintains a cannery and packing plant and a force of about one man to each 100 acres of land.

In the care of each grove, as in the yield of the fruit, the cost of the care and the proceeds of the fruit may be, and are, definitely and distinctly accounted for with respect to the specific property owned by the individual.

The purchasers do not possess the knowledge, skill or equipment necessary for the care and cultivation of citrus trees. It would be completely unfeasible and uneconomical for a small owner to take care of his property and therefore he must rely on a service company to do this work. A land sales contract and the service contract therefore are customarily offered to potential customers simultaneously.

Between the period of February 1941 and May 31, 1943, 85% of the investors who purchased citrus acreage from the Howey Company simultaneously entered into service contracts with the Service Company.

Between February 1, 1941 and May 31, 1943, the Howey Company made 51 sales to 42 persons involving a total of 195.26 acres for $165,788. Eight of these sales were of non-bearing trees totaling 103.21 acres and 43 were sales of bearing trees totaling 92.05 acres. Of the 42 persons, 31 purchased tracts less than 5 acres. The average holding of these persons is 1.33 acre. All but one of these small purchasers made only a single purchase, whereas the 11 purchasers of more than 5 acres purchased their holdings in 19 transactions. Sales of as little as .65 acre, .7 acre, .73 acre were made by the Howey Company. Of the acreage sold 166.54 acres (85%) are being cared for by the Service Company.

Company was contracting for a cultivating, managing and marketing service. Pointing out that the Joiner case,[6] so strongly relied on by plaintiff, as well as those dealing with rabbit, fox, and tung tree culture, had to do with speculative promotions where the thing sold was valueless except as the prospect of a successful promotion gave it value, while here the transactions were not at all promotional but were sales of specific orange groves having an established value and specific contracts for their servicing, he concluded, we think, correctly, that those cases were not at all in point.

He thought, as we do, that the facts that orange groves need cultivating and servicing and that individual owners of small groves are not equipped to do this for themselves but must contract with service companies or others for its being done, were without significance in making the primary determination here. This is whether what Howey sold was a particular grove and what the Service Company sold was a particular service contract, or whether what was done, the sale of the grove and the issuance of the contract, was in effect one transaction, the sale of an interest in a general enterprise of grove cultivation and marketing. He, therefore, correctly concluded that the facts so strongly relied on by the plaintiff: that nearly all of the purchasers were residents of other states who did not expect to, and could not personally cultivate their groves; that some of the groves were very small in extent; and that the Howey Company in connection with the sale of a grove did emphasize the advantage to the purchaser of contracting with its subsidiary, the Service Company, for its servicing; could not convert what was in law and in fact the purchase in fee simple of a designated and described grove, and the making of a separate contract for servicing it, into the purchase of a security, to-wit, an investment contract under which the purchaser acquired not a grove with a separate contract to service it, but an interest in Howey & Company's business of developing, selling and servicing orange groves.

 We, of course, agree with plaintiff that the protection of the invoked statute and the jurisdiction of the commission extend equally to securities of established businesses as to those of new businesses, to non-speculative as well as to speculative investments, and that the fact that an activity or pursuit has passed out of the promotion-al or experimental stage does not at all exempt it from the Act. But it may not be doubted that in close cases, like Joiner's was, the fact that an activity is purely promotional and speculative does have weight in answering the critical question, whether in fact the purchase was of a specific thing having specific value in itself or was of a thing having no value unless the enterprise as a whole should succeed. Where, in short, the seller is not conducting a speculative enterprise, and the thing sold has a specific and definite value apart from the success of the activity which sells it, it is exceedingly difficult to make out such a nexus between the sale and the enterprise sufficient to make the purchase not one of a specific thing but of an interest in the enterprise. On the other hand, when the enterprise is speculative and promotional in character and the thing sold has value only if the enterprise as a whole succeeds, the nexus between purchase and enterprise, which makes them one in the sense that the purchase is really not of a specific thing but of an interest in the enterprise, at once meets the eye of the judge and informs his judgment in the case.

 We cannot agree, therefore, with appellant that the line of demarcation between the purchase of a specific thing and of an interest in an enterprise is to be drawn according to whether the purchaser manages the thing purchased or contracts with others for its management. Such a test would make every purchase of a thing, the management of which was to be conducted through agents, the purchase not of a thing but of an investment contract. Such a test, in the light of the established fact that a great number of properties, especially agricultural properties, are now run not by, but for, their owners under service contracts, is a completely unreal one. Here it is quite clear that each purchaser looked for the income from his investment to the fruitage of his own grove and not to the fruitage of the groves as a whole. It is quite clear, too, that each purchaser's income was in no sense dependent upon the purchase or development of other tracts than his own except in the sense that as grove owners generally prospered, each owner of a grove would. To say that because a purchaser of a farm or a building, at the time and in connection with the purchase, secured the services of another, whether the seller, some one connected with

6 Securities and Exchange Comm. v. Joiner, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88.

him, or some one entirely independent of him, to manage it, he became a purchaser not of property but of a security, an investment contract, is to stretch beyond the breaking point the analogy of the Joiner case. It is, indeed, to run a good principle into the ground. The judgment was right. It is affirmed.