SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff-Appellant,

v.

KOSCOT INTERPLANETARY, INC.,
et al., Defendants-Appellees.

No. 73-2339.

United States Court of Appeals,
Fifth Circuit.

July 15, 1974.

Richard E. Nathan, Asst. Gen. Counsel, David J. Romanski, Atty., David Ferber, Sol., S. E. C., Washington, D. C., James E. Long, John M. Kelly, S. E. C., Atlanta, Ga., for plaintiff-appellant.

Jeffrey Allen Tew, Miami, Fla., for Turner Enterprises.

Theodore I. Koskoff, Bridgeport, Conn., for G. Turner.

Before RIVES, GEWIN and RONEY, Circuit Judges.

GEWIN, Circuit Judge:

This appeal emanates from a district court order denying an injunction sought by the Securities & Exchange Commission (SEC) against Koscot Interplanetary, Inc., (Koscot) for allegedly violating the federal securities laws. Specifically, the SEC maintained that the pyramid promotion enterprise operated by Koscot was within the ambit of the term security, as employed by the Securities Act of 1933 and the Securities Exchange Act of 1934,[1] that as such it had to be registered with the SEC pursuant to the '33 Act,[2] and that the manner in which Koscot purveyed its enterprise to potential investors contravened the anti-fraud provisions of the

1. Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1) (1970) provides as follows:

"(1) the term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

2. Section 5, 15 U.S.C. § 77e (1970).

'34 Act.[3] In a comprehensive opinion, reported at 365 F.Supp. 588 (N.D.Ga. 1973), the district court denied the injunction holding that the Koscot Scheme did not involve the sale of a security. Because of our disagreement with the district court's reasoning, we reverse.

I

A. *The Koscot Scheme*

The procedure followed by Koscot in the promotion of its enterprise can be synoptically chronicled.[4] A subsidiary of Glen W. Turner Enterprises, Koscot thrives by enticing prospective investors to participate in its enterprise, holding out as a lure the expectation of galactic profits. All too often, the beguiled investors are disappointed by paltry returns.

The vehicle for the lure is a multi-level network of independent distributors, purportedly engaged in the business of selling a line of cosmetics. At the lowest level is a "beauty advisor" whose income is derived solely from retail sales of Koscot products made available at a discount, customarily of 45%. Those desirous of ascending the ladder of the Koscot enterprise may also participate on a second level, that of supervisor or retail manager. For an investment of $1,000, a supervisor receives cosmetics at a greater discount from retail price, typically 55%, to be sold either directly to the public or to be held for wholesale distribution to the beauty advisors. In addition, a supervisor who introduces a prospect to the Koscot program with whom a sale is ultimately consummated receives $600 of the $1,000 paid to Koscot. The loftiest position in the multi-level scheme is that of distributor. An investment of $5,000 with Koscot entitles a distributor to purchase cosmetics at an even greater discount, typically 65%, for distribution to supervisors and retailers. Moreover, fruitful sponsorship of either a supervisor or distributor brings $600 or $3,000 respectively to the sponsor.

The SEC does not contend that the distribution of cosmetics is amenable to regulation under the federal securities laws. Rather, it maintains that the marketing of cosmetics and the recruitment aspects of Koscot's enterprise are separable and that only the latter are within the definition of a security. That the district court acknowledged the

---

3. The definition of security enunciated in § 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10) (1970) is substantially identical to that contained in the Securities Act. *See* Tcherepnin v. Knight, 389 U.S. 332, 335–336, 88 S.Ct. 548, 552–553, 19 L.Ed.2d 564, 569 (1967). It is claimed that Koscot violated § 10(b), 15 U.S.C. § 78j(b) (1970) and Rule 10b–5, 17 C.F.R. 240.106–5 (1973).

In addition to the aforementioned relief, the SEC sought the appointment of an equity receiver and an order directing an accounting of Koscot's operations.

4. The district court left little doubt that the scheme is fraudulent. It noted the following:

"In reviewing the record in this case, it is plain that defendants' program is a get-rich-quick scheme in the worst sense. Poor, unwary persons have been induced by high-pressure sales tactics to part with their money, and very few have harvested the large returns they were led to believe were common for those participating in the program."

365 F.Supp. at 590 (N.D.Ga.1973). Koscot does not seriously contest this characterization. Moreover, the record compels the conclusion that Koscot practices were fraudulent.

The district court initially stayed the entry of its judgment because it had been notified by the Judicial Panel on Multi-District Litigation that transfer of this case along with a plethora of others was being considered. Upon being apprised by the Panel on Multi-District Litigation that the motion to transfer had been tentatively denied, the district court lifted the stay. (R. 1038). *See* In Re Glen W. Turner Enterprises Litigation, 355 F.Supp. 1402 (Jud.Pan.Mult.Lit.1973). According to the Judicial Panel on Multi-District Litigation, Glen W. Turner Enterprises, Inc., and its two subsidiaries, Koscot and Dare to ·be Great, are the subject of seventeen actions in ten federal districts. *See* 355 F.Supp. at 1405.

fragmentation discerned by the SEC is witnessed by the following observation:

"Many if not all of the persons, seeking to become Koscot distributors are attracted by the lure of money to be earned by high-pressure recruiting of other persons into the Koscot program, rather than the sale of the cosmetics themselves."

365 F.Supp. at 590. And since case-law countenances the fragmented approach which the SEC presses upon us, see SEC v. United Benefit Life Insur. Co., 387 U. S. 202, 207, 87 S.Ct. 1557, 1559, 18 L.Ed. 2d 673, 677 (1967); SEC v. Glen W. Turner Enterprises, Inc., 474 F.2d 476 (9th Cir.), cert. denied 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), it is upon the promotional aspects that we focus in determining whether Koscot did offer a security.

The modus operandi of Koscot and its investors is as follows. Investors solicit prospects to attend Opportunity Meetings at which the latter are introduced to the Koscot scheme. Significantly, the investor is admonished not to mention the details of the business before bringing the prospect to the meeting, a technique euphemistically denominated the "curiosity approach." The Koscot manual describes the reasoning behind the approach and its operation in the following manner:

"DON'T GO INTO DETAILS. Never explain the program to a prospect before bringing him to an Opportunity Meeting. Do not mention Kosmetics or give any particulars, as many people will prejudge the program and decide it is not for them before they see the presentation.

USE THE CURIOSITY APPROACH. When you invite a prospect to an Opportunity Meeting, arouse his curiosity. Tell him you have discovered a wonderful financial opportunity that will fit him like a glove! Or, tell him you have seen a money tree and would like for him to take a look at it."

Thus, in the initial stage, an investor's sole task is to attract individuals to the meeting.

Once a prospect's attendance at a meeting is secured, Koscot employees, frequently in conjunction with investors, undertake to apprise prospects of the "virtues" of enlisting in the Koscot plan. The meeting is conducted in conformity with scripts prepared by Koscot. Indeed, Koscot distributes a bulletin which states: ". . . this program is to be presented by the script. It is strongly recommended that you consider replacing any individual who does not present the program verbatim." The principal design of the meetings is to foster an illusion of affluence. Investors and Koscot employees are instructed to drive to meetings in expensive cars, preferably Cadillacs, to dress expensively, and to flaunt large amounts of money. It is intended that prospects will be galvanized into signing a contract by these ostentations displayed in the evangelical atmosphere of the meetings. Go-Tours, characterized by similar histrionics, are designed to achieve the same goal.

The final stage in the promotional scheme is the consummation of the sale. If a prospect capitulates at either an Opportunity Meeting or a Go-Tour, an investor will not be required to expend any additional effort. Less fortuitous investors whose prospects are not as quickly enticed to invest do have to devote additional effort to consummate a sale, the amount of which is contingent upon the degree of reluctance of the prospect.

### B. The District Court

The district court rebuffed the SEC's effort to subject Koscot's promotional scheme to the federal securities laws. The SEC argued that the scheme qualified as a profit-sharing arrangement, an interest commonly known as a security, and an investment contract. The profit-sharing theory was rejected because in the district court's view, a successful recruiting distributor receives not a

share of Koscot's profit but rather a fixed fee. 365 F.Supp. 590–591.[5] The court refused to endorse the SEC's position that the pyramid arrangement constituted an interest "commonly known as a security" for two reasons. First, even under a traditional approach, under which the essential inquiry is how the interest is viewed in legal and financial circles, the question of whether a pyramid arrangement fell within the definition was still a polemical one;[6] and second, the risk capital theory, which allegedly would encompass the Koscot arrangement, was of such recent vintage and had such a mixed reception with the courts that it should not be applied in lieu of the traditional definition.[7]

■ Of more immediate concern is the reasoning employed by the district court in rejecting the SEC's contention that Koscot sold "investment contracts," for it is our disagreement with this conclusion that prompts us to reverse. The district court correctly cited the following language from SEC v. W. J. Howey Co., 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244, 1249 (1946), as the standard controlling its disposition of the case.

"[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person *invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.* . . ." (emphasis added)

This test subsumes within it three elements: first, that there is an investment of money; second, that the scheme in which an investment is made functions as a common enterprise; and third, that under the scheme, profits are derived solely from the efforts of individuals other than the investors. *See, e. g.,* SEC v. Glen W. Turner Enterprises, 474 F.2d 476 (9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973); 1050 Tenants v. Jakobson, 365 F.Supp. 1171, 1176 (S.D.N.Y.1973). The district court pretermitted a consideration of the first two elements in finding that the third component of the test was not satisfied because Koscot investors expended effort in soliciting re-

---

5. The district court in SEC v. Turner Enterprises, 348 F.Supp. 766, 776 (D.Or.1972), aff'd, 474 F.2d 476 (9th Cir. 1973), drew the contrary conclusion, reasoning that in the Dare to be Great Enterprises, "[w]hat the investors receive, afterall, is a right to a cut of the profits from other investors." The Oregon district court dismissed as insignificant the fact that the entire profits are not distributed to all investors.

6. The parameters of the phrase "commonly known as a security", like those of the phrase "interest in a profit sharing arrangement" are largely unrefined in federal law. They have, however, been defined by state courts. For an extended analysis of such developments, see Comment, Pyramid Marketing Plans and Consumer Protection: State & Federal Regulation, 21 J. of Public Law 445 (1972).

7. The thrust of the inquiry under the risk capital test is whether the investor has subjected his money to the risk of an enterprise over which he exercises no managerial control. See SEC v. Glen W. Turner Enterprises, Inc., 348 F.Supp. 766, 773–774 (D. Or.1972), aff'd, 474 F.2d 476 (9th Cir.),

cert. denied, 414 U.S. 82, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). The Oregon district court, unlike the district court below, concluded that this approach had sufficient judicial support to warrant its application in determining whether an interest is commonly known as a security.

We would note that there is some overlap between the risk capital approach, as employed by the district court in *Turner* in determining whether an interest is commonly known as a security, and the managerial control test utilized by the Court of Appeals in *Turner* in defining whether an investment contract exists. The overlap can be ascribed to the fact that the element of managerial control is implicit in the risk capital test as derived from Silver Hills Country Club v. Sobieski, 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961). See Note, Pyramid Schemes: Dare Be Regulated, 61 Geo.L.J. 1257, 1279 (1973). The risk capital approach is discussed in further detail in Comment, Pyramid Marketing Plans and Consumer Protection: State and Federal Regulation, 21 J. of Public Law 445, 457–464 (1973) and Note, Pyramid Schemes: Dare Be Regulated, *supra.*

cruits to meetings, in participating in the conduct of meetings, and in attempting to consummate the sale of distributorships and subdistributorships. Moreover, it specifically rejected the less idolatrous adherence to the *Howey* language manifest in SEC v. Glen W. Turner Enterprises, Inc., *supra,* reasoning that the Ninth Circuit's interpretation was antagonistic to the literal approach of both this Circuit and the Supreme Court.

## II

Thus, we are called upon to address that which the court below did not consider—whether the Koscot scheme satisfies the first two elements of the *Howey* test—and that which the district court did consider—whether the scheme satisfies the third component of the test. The latter inquiry entails, in the first instance, a determination of whether the "solely from the efforts of others" standard is to be literally or functionally applied. We address these issues seriatim.

### A. *The First Two Elements*

■ Since it cannot be disputed that purchasers of supervisorships and distributorships made an investment of money, *cf.* SEC v. Glen W. Turner Enterprises, Inc., *supra,* at 481, our initial concern is whether the Koscot scheme functions as a common enterprise. As defined by the Ninth Circuit, "[a] common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." SEC v. Glen W. Turner Enterprises, Inc., *supra* at 482 n. 7. The critical factor is not the similitude or coincidence of investor input, but rather the uniformity of impact of the promoter's efforts.

That this definition comports with the standard applied by the Supreme Court and this Circuit is witnessed by an examination of the reasoning employed in *Howey, supra,* and in Blackwell v. Bentsen, 203 F.2d 690 (5th Cir. 1953), cert.

dismissed, 347 U.S. 925, 74 S.Ct. 528, 98 L.Ed. 1078 (1954). In *Howey,* the Court of Appeals had concluded that an investment contract did not exist where the management and cultivation of citrus acreage was entrusted to the promoter, with the rate of the investor's return to be measured by the produce of the acreage he owned. The Court of Appeals explained that:

"Here it is quite clear that each purchaser looked for the income from his investment to the fruitage of his own grove and not to the fruitage of the groves as a whole. *It is quite clear, too, that each purchaser's income was in no sense dependent upon the purchase or development of other tracts than his own except in the sense that as grove owners generally prospered, each owner of a grove would."* (emphasis added)

151 F.2d 714, 717 (5th Cir. 1945). In reversing, the Supreme Court emphasized not whether profits were pooled, but rather the fact that the feasibility and success of the enterprise, in attracting individuals to invest, and in cultivating, harvesting and marketing the citrus products, rested on the availability of the Howey Company's management:

"Such persons [investors] have no desire to occupy the land or to develop it themselves; they are attracted solely by the prospects of a return on their investment. Indeed, individual development of the plots of land that are offered and sold would seldom be economically feasible due to their small size. Such tracts gain utility as citrus groves only when cultivated and developed as component parts of a larger area. *A common enterprise managed by respondents or third parties with adequate personnel and equipment is therefore essential if the investors are to achieve their paramount aim of a return on their investments."* (emphasis added)

328 U.S. at 300, 66 S.Ct. at 1103, 90 L. Ed. at 1250. Moreover, in Blackwell v. Bentsen, *supra,* involving investments in a tract which was part of an 800 acre

unit to be developed and marketed as a citrus grove, this Court implicitly rejected any requirement of coterminality of investor input. For there, investors were permitted to sell the produce of their own acreage if they elected to do so.

■ Similarly, here, the fact that an investor's return is independent of that of other investors in the scheme is not decisive. Rather, the requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the Koscot meetings and guidelines on recruiting prospects and consummating a sale. *See* SEC v. Glen W. Turner Enterprises, Inc., *supra* at 482; United States v. Herr, 338 F.2d 607 (7th Cir. 1964), cert. denied, 382 U.S. 999, 86 S.Ct. 563, 15 L. Ed.2d 487, rehearing denied, 383 U.S. 922, 86 S.Ct. 898, 15 L.Ed.2d 679 (1966); *cf.* Marshall v. Lamson Bros. and Co., 368 F.Supp. 486, 488 (S.D.Iowa 1974); Mitzner v. Cardet International, Inc. et al., 358 F.Supp. 1262, 1265 (N.D. Ill.1973).[8]

### B. *The Third Element—Solely from the Efforts of Others*

■ As was noted earlier, the critical issue in this case is whether a literal or functional approach to the "solely from the efforts of others" test should be adopted, *i. e.*, whether the exertion of some effort by an investor is inimical to the holding that a promotional scheme falls within the definition of an investment contract. We measure the viability of the SEC's advocacy of a functional approach by its compatibility with the remedial purposes of the federal securities acts, the language employed and the derivation of the test utilized in *Howey*, and the decisions in this circuit and other federal courts.

### 1. *The Legal Standard*

■ We begin our analysis by noting that the 1933 and 1934 Acts are remedial in nature,[9] Affiliated Ute Citizens v. United States, 406 U.S. 128, 151, 92 S. Ct. 1456, 1471, 31 L.Ed.2d 741, 760 (1972); SEC v. W. J. Howey Co., *supra*, 328 U.S. at 299, 66 S.Ct. at 1103, 90 L. Ed. at 1250; Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L. Ed.2d 564, 569 (1967), and hence are to be broadly construed. Tcherepnin v. Knight, *supra* at 336, 88 S.Ct. at 553, 19 L.Ed.2d at 569; Ayers v. Wolfinbarger, 491 F.2d 8, 16 (5th Cir. 1974); SEC v. Glen W. Turner Enterprises, Inc., 474 F.2d at 480–481; Nor-Tex Agencies, Inc. v. Jones, 482 F.2d 1093, 1098 (5th Cir. 1973), cert. denied, 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 873 (1974); SEC v. MacElvain, 417 F.2d 1134, 1137 (5th Cir. 1969). This court recently reaffirmed these principles, noting in Small-

---

8. A more stringent interpretation of the commonality requirement is reflected in Milnarik v. M–S Commodities Inc., 457 F.2d 274 (7th Cir.), cert. denied, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972). Investors there deposited money with one Nelson, with the understanding that he could employ the funds at his discretion to trade in commodity futures. Although all investors relied on Nelson's discretion, the court found the requisite commonality absent because there was no evidence that Nelson traded in a uniform manner or that investors shared ratably in profits derived from his purchases of futures. *See also* Wasnowic v. Chicago Bd. of Trade et al., 352 F.Supp. 1066 (M.D.Pa. 1972), aff'd without opinion, 491 F.2d 752 (3d Cir. 1973), cert. denied, —— U.S. ——, 94 S.Ct. 2407, 40 L.Ed.2d 773, No. 73–1409, 42 U.S.L.W. 3628 (May 14, 1974); Stuckey v. duPont Glore Forgan Inc., 59 F.R.D. 129,

131 (N.D.Cal.1973). *Contra*, Marshall v. Lamson Bros. & Co., *supra*; Berman v. Orimer Trading, Inc., 291 F.Supp. 701, 702 (S.D.N.Y.1968).

9. The remedial purposes of the Securities Act of 1933, were expressed as follows:
   "The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation against the competition afforded by dishonest securities offered to the public through crooked promotion, . . ."
   *See* Senate Committee on Banking & Currency, S.Rep.No.47, 73d Cong., 1st Sess. 1 (1933).

wood v. Pearl Brewing Co., 489 F.2d 579, 592 (5th Cir. 1974), that "[t]he securities laws are intended to protect investors not merely to test the ingenuity of sophisticated corporate counsel."

A literal application of the *Howey* test would frustrate the remedial purposes of the Act. As the Ninth Circuit noted in SEC v. Turner Enterprises, Inc., *supra* at 482, "[i]t would be easy to evade [the *Howey* test] by adding a requirement that the buyer contribute a modicum of effort." *See also* Lino v. City Investing Co., 487 F.2d 689, 692–693 (3d Cir. 1973). The Supreme Court admonished against such a rigid and quixotic application, noting in Tcherepnin v. Knight, *supra,* 389 U.S. at 336, 88 S.Ct. at 553, 19 L.Ed.2d at 569, that in searching for the meaning and scope of the word security, form should be disregarded for substance, and proclaiming in SEC v. W. J. Howey Co., 328 U.S. at 301, 66 S.Ct. at 1104, 90 L.Ed. at 1251, that "[t]he statutory policy of affording broad protection to investors is not to be thwarted by unrealistic and irrelevant formulae." It would be anomalous to maintain that the Court in *Howey* intended to formulate the type of intractable rule which it had decried. The admitted salutary purposes of the Acts can only be safeguarded by a functional approach to the *Howey* test.

Moreover, a close reading of the language employed in *Howey* and the authority upon which the Court relied suggests that, contrary to the view of the district court, we need not feel compelled to follow the "solely from the efforts of others" test literally. Nowhere in the opinion does the Supreme Court characterize the nature of the "efforts" that would render a promotional scheme beyond the pale of the definition of an investment contract. Clearly the facts presented no issue of how to assess a scheme in which an investor performed mere perfunctory tasks. Indeed, just prior to concluding that the sales of

units of citrus grove development, coupled with contracts for cultivating, marketing and remitting the net proceeds to investors constituted sales of investment contracts, the Court observed that "the promoters *manage, control* and *operate* the enterprise." 328 U.S. at 300, 66 S. Ct. at 1104, 90 L.Ed. at 1250 (emphasis added). One commentator has seized upon the italicized words in concluding that only schemes in which investors exercise managerial control are excluded from the definition of investment contracts. *See* Long, An Attempt to Return "Investment Contracts" to the Mainstream of Securities Regulation, 24 Okla.L.Rev. 135, 176 (1971).

The derivation of the "solely from the efforts of others" test also tends to belie a talismanic approach to its application. The Court reasoned in *Howey* that Congress intended that this test be applied because it had been crystallized by prior state court interpretations. 328 U.S. at 298 n. 4, 66 S.Ct. at 1103 n. 4, 90 L.Ed. at 1249 n. 4. In the only state case cited in the body of the opinion, State v. Gopher Tire & Rubber Co., 146 Minn. 52, 177 N.W. 937 (1920), the agreement signed by investors in the scheme contemplated that such investors would act as "booster agents" for the sale of Gopher Tire & Rubber Company's goods. 146 Minn. at 56, 177 N.W. at 938. And in one of the cases cited in footnote 4 of *Howey, supra,* 328 U.S. at 298 n. 4, 66 S.Ct. at 1103, 90 L.Ed. at 1249, Stevens v. Liberty Packing Corp., 111 N.J.Eq. 61, 161 A. 193 (1932), the scheme envisioned even more substantial participation by an investor. Under the second of two plans devised for raising rabbits, an investor would raise rabbits sold to him by the company which would in turn then purchase the offspring for a fixed price per head. Despite the efforts that an investor with Liberty Packing Corp. might expend, the New Jersey court deemed the rabbit breeding scheme to involve an investment contract.[10] Thus, it is apparent that

---

10. The district court discounted State v. Gopher Tire & Rubber Co. as a case materially

different from the one presented before it, noting that in the *Gopher Tire* program, an

neither Congress, in fashioning a definition of an investment contract nor the Court in interpolating this definition, could have relied upon crystallized authority endorsing a litmus formula.[11] This observation militates against the conclusion that the test was intended to exclude from the definition of investment contract, any scheme where an investor contributed a nominal menial effort.

Subsequent case-law also supports the conclusion that the *Howey* test is not possessed of the talismanic quality ascribed to it by the court below. In SEC v. United Benefit Life Insurance Co., 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967), the Supreme Court held that the accumulation provisions of an annuity contract constituted an investment contract. Significantly, Justice Harlan failed to cite *Howey*, but rather announced the test as being " 'what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.' " 387 U.S. at 211, 87 S.Ct. at 1562, 18 L. Ed.2d at 680, quoting SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344, 352, 353, 64 S.Ct. 120, 124, 125, 88 .L.Ed. 88, 93, 94. Were the *Howey* definition to occupy the exalted position in invest-

ment contract adjudication attributed to it by Koscot, Justice Harlan inexorably would have relied upon it. We would note too that the Court of Appeals in both this Circuit and the Tenth and Second Circuits have on occasion deemed schemes to be investment contracts in reliance upon the aforementioned language from *Joiner* and not that from *Howey*. *Compare* Buie v. United States, 420 F.2d 1207, 1210 (5th Cir. 1969), cert. denied, 398 U.S. 932, 90 S.Ct. 1830, 26 L.Ed.2d 97 (1970) (sale of oil and gas leases to be operated by sellers), *with* Continental Marketing Corp. v. SEC, 387 F.2d 466 (10th Cir. 1967), cert. denied, 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968) (sale of live beavers with purchasers exhorted to contract with a professional rancher to raise them), *and* Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027, 1034 (2d Cir. 1974) (sale of Scotch whiskey warehouse receipts).

Moreover, a significant number of federal courts invoking the *Howey* test, have either given it a broader more salutary application or endorsed such an application in principle. Thus, in several cases where the scheme required or envisioned the possibility of participation by an investor in the enterprise, courts nevertheless found an investment contract

---

investor's return was not directly linked to his own effort. *See* 365 F.Supp. at 591 n. 1. We discern no material distinction in this respect between the Koscot program and that offered in Stevens v. Liberty Packing Corp., *supra*, a fact which attenuates the import of the district court's observations concerning the *Gopher Tire* case.

11. The Supreme Court also cited four circuit court cases as support for the "solely from the efforts of others" test. *See* SEC v. W. J. Howey Co., 328 U.S. at 299, n. 5, 66 S.Ct. at 1104, 90 L.Ed. at 1250, n. 5. An examination of these cases suggests that the word "solely" or alternatively entirely, was not irrevocably entrenched in federal law. In SEC v. Crude Oil Corp. of America, 93 F.2d 844 (7th Cir. 1937), the court did not mention the word *entirely*. In SEC v. Universal Service Ass'n, 106 F.2d 232, 237 (7th Cir. 1939), the Seventh Circuit defined an investment contract as "[t]he investment of mon-

ey with the expectation of profit through the efforts of [others]." In Atherton v. United States, 128 F.2d 463 (9th Cir. 1942), while noting that purchasers looked entirely to the efforts of promoters to make their investment a propitious one, the court announced the legal principle to which it was adhering as follows: "[i]n cases where the investor looks to the promoter to determine the success of the investment, it has uniformly been held by the federal courts that unit transactions of this general character involve the sale of a security. . . . " *Id.* at 465. The Ninth Circuit subsequently ascribed the derivation of an "entirely" test to *Atherton* and SEC v. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), in Penfield Co. of Cal. v. SEC, 143 F.2d 746 (9th Cir. 1944). We find nothing in the *Joiner* opinion, however, that compels an endorsement of an "entirely" or "solely" standard.

to exist. *See* Miller v. Central Chinchilla Group, Inc., 494 F.2d 414 (8th Cir. 1974) (investors purchased and raised Chinchillas which were then repurchased by promoters and sold by latter to new prospects); SEC v. Glen W. Turner, *supra* (promotion of self improvement courses by investors to new prospects); United States v. Herr, *supra* (investors in records and success manuals sold by American Sales Training Research Associates, Inc. (ASTRA), in addition to receiving higher returns for self distribution as opposed to distribution by ASTRA sales force, received additional money from bringing in other inactive distributors); Blackwell v. Bentsen, *supra* (deeds for citrus acreage and management contracts, with provision that purchasers are permitted to give directions as to the marketing of crops on their tract); 1050 Tenants v. Jakobson, 365 F.Supp. 1171 (S.D.N.Y.1973) (offering of shares of stock, entitling purchasers to proprietary leases in apartment at 1050 Park Avenue, which after closing date, was to be managed by tenants); Mitzner v. Cardet International, Inc. et al., 358 F.Supp. 1262 (N.D.Ill.1973) (scheme wherein area managers recruited area distributors who in turn found people to deliver Cardet brochures and pick up orders and deliver Cardet products to purchasers); SEC v. Addison, 194 F.Supp. 709 (N.D.Tex.1961) (in lieu of investing capital in potential profits of a mining company, workers were entitled to invest by participating in mining and other operations on a non-salaried basis).[12] Two Circuits, while finding conventional franchise agreements beyond the reach of the securities laws, have explicitly endorsed the broader definition of investment contract. *Compare* Lino v. City Investing Co., 487 F.2d 689, 692 (3d Cir. 1973) *with* Nash & Associates, Inc. v. Lum's of Ohio, 484 F.2d 392, 395 (6th Cir. 1973). *See also* L. M. H. Inc. v. Lewis, 371 F.Supp. 395, 397 (D.N.J.1974).[13] The prevailing scholar-

12. The Tenth Circuit in Andrews v. Blue, 489 F.2d 367 (10th Cir. 1973) may have sub silentio endorsed a more resilient approach to the test. In this case, Andrews engaged in a joint venture involving real estate with Blue and Austin, pursuant to which Andrews contributed $36,899.22 and agreed to use his real estate expertise as a consultant for the enterprise. In holding an investment contract to exist, the court noted that Andrews' role as a consultant was only a nominal one and that Andrews in fact possessed no managerial status. *Id.* at 375. Significantly, however, the court had previously observed that "Andrews invested the agreed sum and *devoted substantial time to the development of the property* [which was the subject of the joint venture]." *Id.* at 371 (emphasis added).

13. In several other cases, the federal courts have given limited expression to a functional application of the *Howey* test by emphasizing that it is the managerial role performed by an investor that differentiates an enterprise from one involving a conventional investment contract. Such emphasis, implying, as it does, that the exertion of some effort by an investor is not antagonistic to a finding that an investment contract exists, belies a literal application of the *Howey* test. Thus, in Mr. Steak, Inc. v. River City Steak, 460 F.2d 666 (10th Cir. 1972), aff'g, 324 F. Supp. 640 (D.Colo.1970), involving a counterclaim to an action for breach of a franchise agreement, the Tenth Circuit quoted the district court's characterization of restaurant franchise as follows:

". . . [D]efendant has not endeavored to show that it was prevented from directing the operations of the restaurant or that it lacked the requisite knowledge, skill or expertise to undertake that task. * * * We *contrast the usual investor-promoter situation, where the skill of ingenuity of the investor does not determine the success or failure of the venture and where the investor's fortunes parallel those of the promoter,* to the present situation, where River City Steak's enterprise stands or falls independently of Mr. Steak's success or failure." (emphasis added).

460 F.2d at 670, *quoting* 324 F.Supp. at 645. In Wieboldt v. Metz, 355 F.Supp. 255, 260 (S.D.N.Y.1973), the district court acknowledged that the risk capital approach which it deemed to have been applied by the Ninth Circuit in *Turner* provides useful input in determining whether a franchise is a security. Finally, in Beefy Trail, Inc. v. Beefy King Intl., Inc., 348 F.Supp. 799, 805 (M.D. Fla.1972), the court held a restaurant franchise not to fall within the ambit of the term investment contract, reasoning that this was not a situation where the investor's predominant concern was accrual of financial gain attributable to the efforts of others unknown to and outside the control of the investor.

ly commentary comports with this view. *E. g.*, Long, An Attempt to Return "Investment Contracts" to the Mainstream of Securities Regulation, 24 Okla.L.Rev. 135, 144 (1971); Coffey, The Economic Realities of a "Security": Is There a More Meaningful Formula?, 18 W.Res. L.Rev. 367, 377 (1967); Comment, Pyramid Marketing Plans and Consumer Protection: State and Federal Regulation, 21 J. of Public Law 445, 460 (1972); Note, Securities Regulation of Pyramid Schemes, 51 Texas L.Rev. 788, 794 (1973); Note, Pyramid Schemes: Dare to be Regulated, 61 Geo.L.J. 1257, 1280 (1973).

■ In view of these developments and our analysis of the import of the language in and the derivation of the *Howey* test, we hold that the proper standard in determining whether a scheme constitutes an investment contract is that explicated by the Ninth Circuit in SEC v. Glen W. Turner Enterprises, Inc., *supra*. In that case, the court announced that the critical inquiry is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.* at 482.[14]

Contrary to the view of the district court, our adoption of this test repre-sents no fundamental departure from the standard we have previously applied. Indeed, our canvass of the cases presenting an investment contract issue to this court, *see* Nor-Tex Agencies, Inc. v. Jones, *supra*; SEC v. MacElvain, *supra*; Buie v. United States, *supra*; Lynn v. Caraway, 379 F.2d 943 (5th Cir. 1967), cert. denied, 393 U.S. 951, 89 S.Ct. 373, 21 L.Ed.2d 362 (1968); Moses v. Michael, 292 F.2d 614 (5th Cir. 1961); Roe v. United States, 287 F.2d 435 (5th Cir.), cert. denied, 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29 (1961), second appeal, 316 F.2d 617 (5th Cir. 1963); Blackwell v. Bentsen, *supra*; SEC v. W. J. Howey Co., 151 F.2d 714 (5th Cir. 1945), rev'd, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), reveals that it has only been in two instances that schemes have been deemed to fall without the definition. In *Howey* of course, the Supreme Court disabused us of our misguided reasoning. And in Lynn v. Caraway, *supra,* the sale of fractional undivided interests in oil and gas leases with the seller relinquishing all control to the purchaser could not have qualified as an investment contract under any conceivable legitimate test. The disposition in these two cases in no way militates against our adoption of a resilient standard which will allow for a practical and dynamic scrutiny of investment

14. This test derives support from the language employed in Lino v. City Investing Co., *supra*; Nash & Associates Inc. v. Lum's of Ohio, *supra*; 1050 Tenants v. Jakobson, *supra*; Mitzner v. Cardet International Inc., et al., *supra*; and the cases cited in note 13 *supra*, where the element of investor managerial control was emphasized as a critical index in determining whether or not an investment contract existed.

This test also comports with the position adopted by the SEC. Securities Act Release No. 5211 (Nov. 30, 1971), reported in 1971–72 Transfer Binder CCH Fed.Sec.L.Rep. # 98446, provides as follows:

"It must be emphasized that the assignment of nominal or limited responsibilities to the participant does not negative the existence of an investment contract; where the duties assigned are so narrowly circumscribed as to involve little real choice of action or where the duties assigned would in any event have little di-rect effect upon receipt by the participant of the benefits promised by the promoters, a security may be found to exist. As the Supreme Court has held, emphasis must be placed upon economic reality. *See* Securities and Exchange Commission v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). While the Commission has not taken the position that a franchise arrangement necessarily involves the offer and sale of a security, in the Commission's view a security is offered or sold where the franchisee is not required to make significant efforts in the operation of the franchise in order to obtain the promised return."

Since a ruling fashioned by an agency charged with administering a statute, though not dispositive, is entitled to great weight, *e. g.*, Zeller v. Bogue Electric Maufacturing Corp., 476 F.2d 795, 800 (2d Cir. 1973), we must pay heed to the SEC's position.

schemes. Indeed, the decision in Blackwell v. Bentsen, *supra*, may have presaged such an adoption, for there this court held an investment contract was established by a scheme involving deeds for citrus acreage and management contracts, despite the proviso in the management contracts that purchasers were permitted to direct the marketing of the produce from their particular tracts.[15]

### 2. Application of the Test to the Instant Facts

■ Having concluded that the district court misperceived the controlling standard, it becomes incumbent upon us to determine whether Koscot's scheme falls with the standard adopted. The deference customarily tendered to fact findings rendered by a district court is inappropriate where, as here, the findings are tainted by application of an erroneous legal principle. *See* Rowe v. General Motors Corp., 457 F.2d 348, 356 n. 15 (5th Cir. 1972); United States v. Jacksonville Terminal Co., 451 F.2d 418, 423–424 (5th Cir. 1971); United States v. Pickett's Food Service, 360 F.2d 338, 341 (5th Cir. 1966); Ferran v. Flemming, 293 F.2d 568, 571 (5th Cir. 1961).

Our task is greatly simplified by the Ninth Circuit's decision in SEC v. Glen W. Turner Enterprises, Inc., *supra.* The promotional scheme confronting the Ninth Circuit is largely paralleled by that exposed before this court. Dare to be Great, (Dare) which like Koscot, is a subsidiary of Turner Enterprises, offered five plans in its self-improvement program, three of which entitled an investor to earn money for coaxing additional prospects into the Dare fold. To a purchaser of a plan denominated Adventure III, costing $2,000, Dare proffered tutelage on sales motivation and sales ability and authority to sell Adventures I, II and III. Remuneration for a sale of each plan amounted to $100, $300 and $900 respectively. Dare bestowed the same benefits upon investors of Adventure IV but with the additional opportunity to receive $2,500 compensation for sales of Adventure IV to new prospects. This plan cost $5,000. A purchaser of the $1,000 plan would receive basically the same benefits as would a purchaser of Adventure II, *i. e.*, the sales material, and was empowered to sell the plan. Financial gain would inure to him after his seller consummated a sale with two prospects steered by him to his seller. The purchaser would then be entitled to sell plans on his own, being remunerated at $400 per sale. Alternatively a purchaser who lures three people into the scheme would be entitled to sell the $1,000 plan without buying it himself.

As in the Koscot scheme, the initial task of a purchaser of a Dare plan was to lure prospects to meetings, denominated Adventure Meetings. These were characterized by the same overzealous and emotionally charged atmosphere at which the illusion of affluence fostered in Opportunity Meetings was created and relied upon in securing sales. The Adventure Meetings were run according to script but, as the Ninth Circuit noted, "The Dare People, not the purchaser-'salesmen', run the meetings and do the selling." 474 F.2d at 479. Considerable effort was exerted to consummate the

---

15. In addition to misconceiving this court's approach to prior investment contract adjudications, the district court overstated the prophylactic bent assumed by the Ninth Circuit which decided *Turner*. We note that in Chapman v. Rudd Paint and Varnish Company, 409 F.2d 635 (9th Cir. 1969), the Ninth Circuit ritualistically applied the "solely from the efforts of [others]" test to a distributorship of a product known as "Run-Guard," a substance designed to prevent runs in nylon hosiery. Thus, after observing that the brochure utilized by Rudd Paint and Varnish Company to attract distributors minimized the amount of effort required by a distributor and maximized that required of the franchisor, the court maintained that ". . . the very fact that the brochure emphasizes the amount of assistance the company will provide *implies that the distributor is also to contribute an effort.*" *Id.* at 641 (emphasis added). This reasoning can hardly be deemed the harbinger of the result reached in *Turner*, where the Ninth Circuit did not even allude to *Chapman* in adopting a more functional test.

sale at the Adventure Meeting, with the sale sometimes being closed by the investor but frequently by Dare salesmen. 474 F.2d at 479. The Ninth Circuit's assessment of the significance of these facts was as follows:

"In this case, Dare's source of income is from selling the Adventures and the Plan. The purchaser is sold the idea that he will get a fixed part of the proceeds of the sales. In essence, to get that share, he invests three things: his money, his efforts to find prospects and bring them to the meetings, and whatever it costs him to create an illusion of his own affluence. He invests them in Dare's get-rich-quick scheme. What he buys is a share in the proceeds of the selling efforts of Dare. Those efforts are the *sine qua non* of the scheme; . . . those efforts are what produces the money which is to make him rich. In essence, it is the right to share in the proceeds of those efforts that he buys. In our view, the scheme is no less an investment contract merely because he contributes some effort as well as money to get into it."

474 F.2d at 482. We conclude that the facts in the instant case can be evaluated along similar lines.

The recruitment role played by investors in Koscot coincides with that played by investors in Dare to be Great. That investors in the latter did not participate in Adventure Meetings while they do in the Koscot scheme is insignificant. Since Koscot's Opportunity Meetings are run according to preordained script, the deviation from which would occasion disapprobation or perhaps exclusion from the meetings, the role of investors at these meetings can be characterized as little more than a perfunctory one. Nor does the fact that Koscot investors may have devoted more time than did Dare investors to closing sales transmute the essential congruity between the two schemes. The act of consummating a sale is essentially a ministerial not managerial one, *see* Mitzner v. Cardet International, Inc. et al., *supra* at 1267–1268,

one which does not alter the fact that the critical determinant of the success of the Koscot Enterprise lies with the luring effect of the opportunity meetings. As was noted earlier, investors are cautioned to employ the "curiosity approach" in attracting prospects. Once attendance is secured, the sales format devised by Koscot is thrust upon the prospect. An investor's sole contribution in following the script is a nominal one. Without the scenario created by the Opportunity Meetings and Go-Tours, an investor would invariably be powerless to realize any return on his investment.

### III

■ We confine our holding to those schemes in which promoters retain immediate control over the essential managerial conduct of an enterprise and where the investor's realization of profits is inextricably tied to the success of the promotional scheme. Thus, we acknowledge that a conventional franchise arrangement, wherein the promoter exercises merely remote control over an enterprise and the investor operates largely unfettered by promoter mandates presents a different question than the one posed herein. But the Koscot scheme does not qualify as a conventional franchising arrangement.

We are mindful of the caveat expressed by Justice Brennan, concurring in SEC v. Variable Annuity Life Insurance Co., 359 U.S. 65, 80, 79 S.Ct. 618, 626, 3 L.Ed.2d 640, 649 (1959), that courts should not assume that merely because subjection of a particular scheme to federal regulation is desirable, it has been accomplished. But as Justice Brennan also noted, "[o]ne must apply a test in terms of the purposes of the Federal Acts." *Id. See also* SEC v. C. M. Joiner Leasing Corp., *supra,* 320 U.S. at 350, 64 S.Ct. at 123, 88 L.Ed. at 93. The test we adopt comports with the principal purpose of the Securities Acts, as announced in Smallwood v. Pearl Brewing Company, *supra*. It also comports with the observation of the Su-

**486**

preme Court in SEC v. W. J. Howey Co., *supra*, 328 U.S. at 299, 66 S.Ct. at 1103, 90 L.Ed. at 1250, that the definition of securities "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." We merely endorse a test which is resilient enough to encompass the egregious promotional scheme purveyed by Koscot.

Accordingly, this cause is reversed and remanded for further proceedings consistent with this opinion.

Reversed and remanded.