**SECURITIES AND EXCHANGE COMMISSION**

v.

**KOSCOT INTERPLANETARY, INC., a Florida corporation, et al.**

**Civ. A. No. 17134.**

United States District Court,
N. D. Georgia,
Atlanta Division.
April 19, 1973.

David J. Romanski, John M. Kelley, Jennie H. Randolph, James Edgar Long, Securities & Exchange Commission, Atlanta, Ga., Richard E. Nathan, Asst. General Counsel, Securities & Exchange Commission, Washington, D. C., for plaintiff.

Tew, Tew, Rozen & Murray, Miami, Fla., Hull, Towill, Norman, Barrett & Johnson, Augusta, Ga., for defendants Koscot, Glenn W. Turner Enterprises, Atkinson, Carroll, and Hubbard.

Theodore I. Koskoff, Bridgeport, Conn., for Glenn Wesley Turner.

John A. Burgess, Montpelier, Vt., for Wilder.

SIDNEY O. SMITH, Jr., Chief Judge.

The Securities and Exchange Commission seeks an injunction against violation of the federal securities laws and other relief. More specifically, the SEC wishes to bar defendants from marketing their products through a program which the SEC characterizes as a pyramid-selling scheme. The Commission urges that the sale of an opportunity to participate in such a pyramiding operation amounts to selling a security within the meaning of the Securities Act of 1933 and Securities Exchange Act of 1934 and that as securities they are unregistered and sold in misleading circumstances so as to violate these laws. Denying any sale or offer to sell securities, defendants have moved to dismiss for failure to state a claim.

In reviewing the record in this case, it is plain that defendants' program is a get-rich-quick scheme in the worst sense. Poor, unwary persons have been induced by high-pressure sales tactics to part with their money, and very few have harvested the large returns they were led to believe were common for those participating in the program. Gross, intentional fraud may well be involved. Nonetheless, the court is not entirely convinced that defendants' operation, outrageous as it may be, actually involves the sale or offer of sale of securities within the meaning of the federal Acts.

▪ Not every get-rich-quick scheme is a "security" within the meaning of federal law, and neither the number or nature of the participants nor possible fraud will transmute the sale of an opportunity to participate actively in a distributorship recruiting program into a sale of a "security" if, in its legal and economic effect, the thing sold is not a "security." *Cf.* Bruner v. State, 463 S.W.2d 205, 215 (Tex.Cr.App.1970) (Onion, J.). If fraud is involved, under present laws redress must normally be found elsewhere, e. g., in state court, rather than in a federal court which most strain and overreach to justify its jurisdiction. Accordingly, the motion to dismiss will be granted.

## The Program

Under well-publicized techniques, Koscot seeks to market a line of cosmetics through a multi-level network of independent distributors. Persons pay Koscot a fee to become distributors. A distributor may earn money by marketing cosmetics or—and this is the gravamen —by finding and recruiting other distributors for Koscot. When a distributor does recruit another person as a Koscot distributor, the recruiter is paid a finder's fee or commission. Many if not all of the persons, seeking to become Koscot distributors are attracted by the lure of money to be earned by high-pressure recruiting of other persons into the Koscot program, rather than the sale of the cosmetics themselves.

## Conclusions

▪ This is a case of statutory construction since the Commission's case rests entirely on the 1933 and 1934 federal securities Acts. The definitions of "security" contained in these Acts are basically the same: *Compare* 15 U.S.C. § 77b(1) *with* 15 U.S.C. § 78c(a)(10). The Commission contends that the sale of a right to participate in Koscot as a distributor capable of making money from the finding and recruiting of other distributors is· a "security" within the meaning of the Acts because it is the sale of (1) a right to participate in a *"profit-sharing agreement"*, (2) an *"investment contract"*, and (3) an *"interest or instrument commonly known as a 'security'."* Each of these emphasized terms is expressly included in the definition of "security" used in the federal Acts.

▪ Generally, the federal securities laws are to be construed broadly so that form is disregarded for substance and that economic realities are emphasized. Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). Thus, these laws reach not only obvious or commonplace securities, but also novel factual situations and devices, if their basic nature is cognizable as a security. *See* Securities & Exch. Comm'n v. Howey Corp., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). With these guidelines in mind, it is necessary to review each of the three categories relied upon by the SEC.

▪ (1) The Koscot program is not a "profit-sharing" arrangement. It is true that when a new distributor joins the Koscot program he pays Koscot a fee and Koscot, itself, pays a fee to the distributor responsible for finding the new distributor. Nevertheless, this does not amount to "profit-sharing". The recruiting distributor is not promised, nor does he receive, a share of Koscot's profit; instead, he is given a fixed fee, regard-

less of Koscot's profits, for his efforts in recruiting a new distributor.

The SEC reminds the court of the need for liberal construction. But to construe the term "profit-sharing" to cover the situation presented here goes in this court's judgment, beyond broad reading, and becomes plain, judicial over-reach. The term "profit-sharing" has an ordinary significance which would be ignored if it were read to treat simple commissions and finder's fees as shares of profits. In view of the economic-reality of this arrangement and the ordinary significance of the term itself, this court cannot say there is any "profit-sharing" involved in defendant's scheme.

■ (2) The distributorship agreements involved in this case are not "investment contracts." For the purpose of the federal securities laws, "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of a third-party." Securities & Exch. Comm'n v. Howey Co., 328 U.S. 293, 298, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946); Lynn v. Caraway, 379 F.2d 943, 945 (5th Cir. 1967); Roe v. United States, 287 F.2d 435, 438 (5th Cir. 1961). Persons who become Koscot distributors are told at the outset that they must work if they are to make money from the Koscot program, and this is true. Unless a distributor expends effort in finding other potential distributors, he will realize no return on the fee he paid Koscot to become a distributor. He must find prospects and persuade them to attend meetings at which the prospects are told more about Koscot. Moreover, his work is not finished by

simply getting the prospect to the recruiting meeting. The current distributors take an active part in the meetings and actually attempt to convince their prospects to join Koscot. Since distributors cannot expect any money from Koscot without considerable effort on their part, the sale of distributorships is not the sale of an "investment contract."[1]

■ The SEC contends that "the solely from the efforts of a third-party" standard for an "investment contract" must not be read literally and further argues that the distributor's efforts in the Koscot program are merely token. Although the Supreme Court and the Court of Appeals for this Circuit have repeatedly included the word "solely" in the definition of an investment contract, a mere token effort from the investor might not be fatal to the existence of an "investment contract." But, even so this court sees the distributor's efforts in the Koscot program as fundamental and substantial, not token. Accordingly, broad reading will not help the Commission in this respect.

The Court of Appeals for the Ninth Circuit recently departed from its previous "solely from the efforts of a third-party" test for an "investment contract." In Securities & Exch. Comm'n. v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476 (9th Cir. 1973), it was held that, as long as someone other than the investor must make the essential managerial efforts which will determine the failure or success of the enterprise, an "investment contract" may exist even if the investor is himself active in the enterprise and, thus, cannot be said to be depending solely on the efforts of others for profit. The Commission would have this court follow this approach.

1. In concluding that an arrangement similar to Koscot's was an "investment contract," one court has relied on the similarity between Koscot's program and the program in State v. Gopher Tire & Rubber Co., 146 Minn. 52, 177 N.W. 937 (1920). *Gopher Tire*, which was relied on by the Supreme Court in *Howey*, is materially different from this case. The program in *Gopher Tire* in reality would permit a person to receive a return on the money he invested with minimal or no effort, because each person's return was not directly linked to his own effort. In the Koscot program, if a person does not work, he will receive no return whatsoever.

However, the Court of Appeals for this Circuit, as well as the Supreme Court, has repeatedly stated the "solely" test as the standard for an investment contract. This district court sees no freedom to coin a new, different and more expansive standard in light of these binding higher court decisions.

■ (3) The Commission's final argument—and in this court's judgment its best—is that the sale of distributorships is the sale of an interest "commonly known as a security." As the court understands the Commission's argument, it relies on either of two separate propositions. First, as contended at trial, the Commission contends that several state courts have held programs similar to defendant's to be securities within the meaning of their "Blue Sky" laws and, thus, this type of program has come to be "commonly known" as a security. Second, the Commission argues that, in light of the recognition of the "risk capital" approach by several state courts, a security is "commonly known" to exist wherever an investor subjects his money to the risk of an enterprise over which he exercises no managerial control and the distributors here exercise no such control.

(a) Some courts have indeed found the Koscot program or a similar program to involve the sale of securities. *See* State v. Hawaii Mkt. Center, Inc., 52 Haw. 642, 485 P.2d 105 (1971); Frye v. Taylor, 263 So.2d 835 (Fla.App. 1972) (program involved profit-sharing within meaning of state security law); Hurst v. Dare to Be Great, Inc., No. 71–160 (D.Or. Jan. 12, 1972) (finding program to be security within meaning of Oregon security law); State v. Glenn Turner Enterprises, Inc., No. 47773 (4th Dist.Ct.Idaho 28 March 1972) (trial court holding that program was security under Idaho law.) But several others have reached the opposite conclusion, although presented with substantially the same facts and statutory language. See Bruner v. State, 463 S.W.2d 205 (Tex. Cr.App.1970); Koscot Interplanetary, Inc. v. King, 452 S.W.2d 531 (Tex.Civ. App.1970); Georgia Mkt. Centers v. Fortson, 225 Ga. 854, 171 S.E.2d 620 (1969); Fidelity Credit Co. v. Bradford, 177 So.2d 635 (La.App.1965); Emery v. So-Soft of Ohio, Inc., 199 N.E.2d 120 (Ohio App.1964); Commonwealth v. Consumers Research Consultants, 414 Pa. 253, 199 A.2d 428 (1964); Gallion v. Alabama Mkt. Centers, 282 Ala. 679, 213 So.2d 841 (1968).

In light of this almost-even split in authority, the mere existence of a few opinions holding that pyramid-selling arrangements, such as Koscot's, are securities within the meaning of some state securities laws, particularly where all those opinions are not from the highest court in their respective jurisdictions, seems insufficient to establish that pyramiding arrangements are actually *"commonly* known" in the commercial and legal circles of the United States as securities. The standard should be one commonly recognized in the financial community. In view of the diverse authority, the court cannot conclude absent a Supreme Court holding that a recognizable national standard exists on this basis. The alternative is chaos and confusion from jurisdiction to jurisdiction.

■ (b) Looking beyond the specific device of pyramiding, the Commission asks this court to hold that a security is "commonly known" to exist wherever a person invests his money in an enterprise over which he exercises no managerial control. Assuming without deciding that the efforts of a Koscot investor are not "managerial", even though obviously necessary to realize any profit, the theory bears serious consideration. This approach, sometimes called the "risk capital" approach to securities,[2]

---

2. The term "risk capital" is used somewhat advisedly here. The risk capital standard has been articulated in more than one form. Thus, its precise meaning is unsettled. Although, as this court understands it, the standard encompasses almost any situation where a person invests his money, with the hope of some return, in an enterprise over

has gained considerable judicial acceptance since it was first enunciated in Silver Hills Country Club v. Sobieski, 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961). See State v. Hawaii Mkt. Center, Inc., 52 Haw. 642, 485 P.2d 105 (1971); State ex rel. Healy v. Consumer Business System, Inc., 5 Or.App. 19, 482 P.2d 549 (1971); State v. Glenn Turner Enterprises, Inc., No. 47773 (Dist.Ct.4th Jud.Dist., Idaho, March 28, 1972). One federal district has directly held that this "risk capital" approach is widely enough known to make it an appropriate test to look to for determining what is "commonly known as a security" within the meaning of the federal securities Acts. See Securities & Exch. Comm'n. v. Glenn W. Turner Enterprises, Inc., 348 F.Supp. 766 (D.Or.1972), aff'd on other grounds as an "investment contract" 474 F.2d 476 (9th Cir. 1973). But see Chapman v. Rudd Paint & Varnish Company, 409 F.2d 635 (9th Cir. 1969). But this court cannot agree this simply. The number of cases invoking the risk capital theory is really not large; only a few jurisdictions have adopted the theory. Moreover, most of the cases applying the "risk capital" theory are quite recent. It might be fair to say that there is emerging a philosophical trend in the law to incorporate the "risk capital" theory into the body of security law generally in this country. But an emerging trend and "commonly known" appear to be different. Except for the recent Oregon case, this approach is traditionally reserved to the states. The recent emphasis in state security legislations has been on the *merits* of the offering, while federal regulation has thus far been limited to the aim of honest *disclosure* at the time of sale irrespective of the fairness of the proposal.[3] Congress, however, did not say that *any* interest known anywhere as a security was to be a "security" within the meaning of the federal Acts. Congress expressly required that if an interest did not fall within the scope of one of the more specific descriptive terms constituting a "security," *e. g.*, an "investment contract," the interest must, if it is to be covered by federal statute, be *"commonly* known" nationally as a "security." For now at least, this court does not regard the "risk capital" theory to be so well-established as to support the conclusion that in commercial and legal circles in this nation arrangements which are not "profit-sharing" agreements or "investment contracts" are nevertheless "commonly" thought to be securities, if they would fit within the scope of the "risk capital" theory.

The motion to dismiss is granted. However, judgment thereon is stayed until further order of the court.[4]

It is so ordered.

which he has no significant control, some courts have limited its applicability to those instances where the investor is providing initial capitalization to an enterprise or some other similar high risk operation.

3. Heretofore, this court has expressed the view that, in light of the wrongs being perpetrated thereunder, the Congress may well wish to broaden the scope of federal control into the franchise-distributorship area. See Cobb v. Network Cinema Corp., 339 F.Supp. 95 at 98 n. 1 (N.D.Ga.1972). One view seems to hold that federal adoption of the "risk capital" theory might well be limited to initial capitalization only. See Mr. Steak, Inc. v. River City Steak, Inc., 324 F.Supp. 640 (D.Colo.1970).

4. After hearing and while this memorandum decision was under preparation, the court was notified by the Judicial Panel on Multi-District Litigation that transfer of this case along with certain private litigation to the Western District of Pennsylvania was to be considered on March 23, 1973. The results of that hearing are unknown.