698 F.2d 1121
 Fed. Sec. L. Rep. P 99,099
Mark VILLENEUVE, individually and on behalf of all other
persons similarly situated, Plaintiffs-Appellants,
v.
ADVANCED BUSINESS CONCEPTS CORPORATION, et al., Defendants-Appellees.
 No. 81-5975.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 22, 1983.
Opinion on Granting of Rehearing En Banc April 6, 1983.
 
 Carl H. Hoffman, Coral Gables, Fla., for plaintiffs-appellants.
 Lanny E. Perkins, Dallas, Tex., Vernon W. Haas, Atty. pro se, Monterey, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before KRAVITCH, HATCHETT and CLARK, Circuit Judges.
 HATCHETT, Circuit Judge:
 
 
 1
 Under the unique facts of this case, we hold that an "area purchaser agreement," i.e., a distributorship, is not an investment contract which constitutes a "security" under the Securities Act of 1933 and the Securities Exchange Act of 1934. We affirm.
 
 BACKGROUND
 
 2
 Advanced Business Concepts Corp. (ABC) offers to the general public, "area purchaser agreements," i.e., distributorships for the sale of self-watering planters. ABC advertises in local newspapers and utilizes booths at various business opportunity shows. Through the use of advertisements, prospects are invited to call ABC at a toll-free number for further information. Upon being contacted by a prospect, ABC explains its business opportunities and schedules appointments with a regional manager. The regional manager contacts the prospect and explains in detail, according to a standardized script, the business opportunities of ABC.
 
 
 3
 For an initial investment, ABC provides the purchaser with a supply of self-watering planters, display merchandise, and a display rack. Additionally, ABC acquires a particular display location which, in most cases, is an established store premise, and assigns the display location to the purchaser. The purchaser is expected to periodically check and restock the displays by reordering self-watering planters from ABC. Moreover, the purchaser's profit is derived from one-half of the proceeds received for the self-watering planters sold by the store; the remaining profits belong to the store. The rights and obligations of the parties are stated in the area purchaser agreement. The agreement provides that the area purchaser is "not [to rely] on any oral or written expressions, promises, or warranties made by anyone to consummate this transaction except those expressly stated herein." Stated in the area purchaser agreement are the following duties of ABC:
 
 
 4
 1. Shipment will be scheduled as soon as possible, but in no case later than forty-five (45) days from approval of agreement.
 
 
 5
 2. To warrant all merchandise and to offer processing of warranty claims in a prompt manner.
 
 
 6
 3. Company agrees to provide Area Purchaser with necessary business forms and other promotional items at no additional cost, such as T.V., radio and newspaper advertising.
 
 
 7
 4. To provide from time to time, at no additional cost, information and bulletins regarding the operation and management of his (her) business.5. To provide protected accounts in the general area assigned to the Area Purchaser.
 
 
 8
 6. To provide, when available and properly marketable, as determined by the Company, the projected product term NATURE-MATIC, an automatic self-watering liner for the NATURE-MATIC planter.
 
 
 9
 7. To provide, as per Addendum "B", one hundred percent (100%) return of initial investment.
 
 
 10
 8. To provide a unique correspondence training program for the benefit of the newly appointed Area Purchaser.
 
 
 11
 9. To offer Area Purchaser first right of refusal on all new products.
 
 
 12
 10. To provide all expense paid 7 day training for Area Purchaser (2 people) with 50 or more accounts, to be held in Dallas, Texas.
 
 
 13
 The duty of the area purchaser is enumerated as follows:
 
 
 14
 1. To regularly and properly call on each of his (her) outlets, restock displays and make cash settlement.
 
 
 15
 2. To maintain a sufficient inventory of Company's products with each of his (her) retail outlets to assure maximum sales potential for the Company and Area Purchaser.
 
 
 16
 3. Area Purchaser agrees that any failure by the Company to make shipments under this Agreement, if caused by floods, strikes, fires, shortages of raw materials or conditions beyond the control of the Company shall not constitute either a default or the basis of a suit for damages.
 
 
 17
 4. To provide Company a monthly Progress Report due no later than the 5th day of each month following acceptance and approval of this Agreement, to determine gross movement of product.
 
 
 18
 Villeneuve, among others, signed such an agreement. After entering into the purchaser agreement, many of the area purchasers failed to realize the expected profits and returns on their investments.
 
 
 19
 Individually, and on behalf of the class of purchasers, Villeneuve brought this suit seeking restitution of $622,372.46. The complaint alleges that the purchaser agreement is a security as defined by section 2(1) of the Securities Act of 1933 and section 3(a)(10) of the Securities Exchange Act of 1934. According to Villeneuve, if the purchaser agreement is a security, ABC has violated the provisions of sections 12(1) and 12(2) of the Securities Act of 1933 by selling unregistered securities, and that relief for the class exists under the securities law. If the purchaser agreement does not constitute a security, Villeneuve's relief is limited to whatever common law causes of action may be available. The district court granted ABC's motion for partial summary judgment by finding that the purchaser agreement was not a security as defined by section 2(1) of the Securities Act of 1933, nor a security under section 3(a)(10) of the Securities Exchange Act of 1934.[1]
 
 
 20
 The crucial issue presented by this case is whether the purchaser exercised such control over the profit potential that the agreement fails to satisfy the definition of an investment contract.
 
 
 21
 Under the Securities Act of 1933, a "security" is defined as:
 
 
 22
 [A]ny note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warranty or right to subscribe to or purchase, any of the foregoing.
 
 
 23
 15 U.S.C.A. Sec. 77b(1). A security is similarly defined in section 3(a)(10) of the Securities Exchange Act of 1934 (15 U.S.C.A. 78c(a)(10)). In fact, the Senate Report on the Securities Exchange Act indicates that the definition of a security under the 1934 Act was intended to be "substantially the same as [contained] in the Securities Act of 1933." S.Rep. No. 792, 73d Cong., 2d Sess. 14 (1934). Included in the definition of a security under both Acts is the term "investment contract."
 
 
 24
 In Securities and Exchange Commission v. W.J. Howey & Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court stated that "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party ...." Howey, 328 U.S. at 298-99, 66 S.Ct. at 1102-1103. This test, for purposes of ascertaining whether an investment contract exists, consists of three elements: (1) an investment of money; (2) a common enterprise; and (3) the expectation of profits to be derived solely from the efforts of others. See Securities and Exchange Commission v. Koscot International, Inc., 497 F.2d 473, 477 (5 Cir.1974). Both parties concede that the first element, an investment of money, exists. ABC, however, does not concede the existence of the second and third elements.
 
 COMMON ENTERPRISE
 
 25
 Villeneuve argues that the "common enterprise" element exists under the purchaser agreement. We agree. The common enterprise element is defined as "[o]ne in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." Securities and Exchange Commission v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476, 482 n. 7 (9th Cir.1973). Similarly, the former Fifth Circuit, in Securities and Exchange Commission v. Koscot International, Inc., 497 F.2d 473, 479 (5th Cir.1974), observed that "the fact that an investor's return is independent of that of other investors in the scheme is not decisive. Rather, the requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [promoter]." After reviewing the record, we conclude that such commonality does exist and is evidenced by the obligation of ABC to provide advertisements, training, products, and to select the areas where products are sold. The failure to provide any of these services would definitely determine the success or failure of the scheme. For these reasons, we find the second element of commonality to exist.
 
 SOLELY FROM THE EFFORTS OF OTHERS
 
 26
 This element has been the subject of much controversy, and this case does not prove to the exception. Villeneuve urges us to expand this element to include those advertising representations made by the promoters in determining whether this requirement has been met. The 1933 and 1934 Acts are remedial in nature. Koscot International, 497 F.2d at 479. They should be broadly construed. Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). With these principles in mind, we refuse to further broaden this element of the test to include advertising representations made by the promoters.
 
 
 27
 Howey provides that the third element is satisfied if the profits are "solely from the efforts of the promoter or third party." Howey, 328 U.S. at 299, 66 S.Ct. at 1103. The former Fifth Circuit in Piambino v. Bailey, 610 F.2d 1306, 1317 (5th Cir.1980), observed that the Supreme Court in United Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), "reaffirmed the test first enunciated in Howey, which had been on the books for thirty years." Although the Supreme Court in Forman acknowledged the existence of a broader test enunciated in Securities and Exchange v. Glenn W. Turner Enterprises, Inc., the Court did not rule expressly on the validity of that test.[2] Forman, 421 U.S. at 852 n. 16, 95 S.Ct. at 2060 n. 16. We adhere to the standard articulated in Howey, reaffirmed in Forman, and adopted by the former Fifth Circuit in Piambino.[3] In Forman, the Court emphasized that, "[i]n searching for the meaning and scope of the word 'security' in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality." 421 U.S. at 848, 95 S.Ct. at 2058.
 
 
 28
 In reviewing a summary judgment, we must do so in the light most favorable to the opposing party (Villeneuve). Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 468, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962); Cubbage v. Averett, 626 F.2d 1307, 1308 (5th Cir.1980). The facts reveal that Villeneuve was required to check and restock the displays, make cash settlements, maintain a sufficient inventory, and provide ABC with monthly progress reports. These actions do not appear to us to fit within the "solely" standard articulated in Howey as amplified in Forman and Piambino mentioned above. Villeneuve possesses such extensive control over the profit potential that it cannot be said that profits are solely through the efforts of ABC, the promoter. "Solely" obviously was intended to mean that the purchasers must depend upon the efforts of others in realizing the potential profits of the investment. Villeneuve and others were not solely dependent upon ABC's efforts to maximize their profits; rather, they too had to make substantial efforts toward the profit. We find that because of these substantial efforts, total control of the profit potential did not rest with ABC.
 
 CONCLUSION
 
 29
 We therefore conclude that the purchaser agreement was not an investment contract, and the district court was correct in granting summary judgment.
 
 
 30
 AFFIRMED.
 
 KRAVITCH, Circuit Judge, dissenting:
 
 31
 The majority reaches its decision by applying the "solely" test first enunciated by the Supreme Court in SEC v. W.J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) in order to determine whether the scheme here at issue is an "investment contract" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934. Since its decision in SEC v. Koscot Interplanetary, Inc., 497 F.2d 473 (5th Cir.1974), however, the law of the former Fifth Circuit, and consequently this circuit, has been to apply a broader form of the Howey test, one that requires the expectation of profit to derive from the "essential managerial efforts" of others. Id. at 483. Because I believe the majority applies the incorrect legal standard when it relies upon Howey, I dissent.
 
 
 32
 In Howey the Supreme Court established a three-part test to determine if a particular transaction is an "investment contract" subject to the securities laws. At issue is the third element of that test, a requirement that the expectation of profits derive "solely from the efforts of the promoter or a third party, ..." 328 U.S. at 299, 66 S.Ct. at 1103 (emphasis supplied). Although the test enunciated in Howey "exactly fitted the circumstances" presented in that case, the Ninth Circuit in SEC v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476, 481 (9th Cir.1973), found the word "solely" to be a "sticking point." Id. The Ninth Circuit therefore adopted a broader interpretation of the Howey test, albeit one it believed involved no major departure from Howey. Id. at 483. The test enunciated by Turner was not whether the expectation of profit derived "solely" from the efforts of others, but whether the "essential managerial efforts which affect the failure or success of the enterprise" are those of a third party. Id. at 483.
 
 
 33
 The Fifth Circuit adopted the Turner test in a case factually similar. SEC v. Koscot Interplanetary, Inc., 497 F.2d 473 (5th Cir.1974). In Koscot the court was asked to determine whether a pyramid promotion enterprise was a security. The enterprise had two elements: the sale of cosmetics, and the recruitment of others to become "Kosmetic" distributors. Id. at 475-76. This latter aspect was the primary subject of the litigation:
 
 
 34
 Many if not all of the persons, seeking to become Koscot distributors are attracted by the lure of money to be earned by high-pressure recruiting of other persons into the Koscot program, rather than the sale of the cosmetics themselves.
 
 
 35
 Id. at 476, quoting SEC v. Koscot Interplanetary, Inc., 365 F.Supp. 588, 590 (N.D.Ga.1973). The task of the investor in Koscot was not a small one. Besides luring a prospect to Koscot's Opportunity Meetings additional effort often was required, "the amount of which [was] contingent upon the degree of reluctance of the prospect." Id. (emphasis supplied).
 
 
 36
 Despite this effort required by the investor the court found that the success or failure of a given sale was dependent upon "the scenario created" by Koscot and that any individual investor "would invariably be powerless to realize any return on his investment." The significant factor was that the "act of consummating a sale is essentially a ministerial not managerial one." Id. at 485.
 
 
 37
 On these facts the Howey test would have barred liability as the expectation of profits did not derive "solely from the efforts" of others. The Koscot court examined the rationale of Howey, however, and determined that the underlying purpose of the securities laws would not be fulfilled by an application of the "solely" test. Rather it adopted the test set out in Turner: "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." Koscot, 497 F.2d at 483 (quoting Turner ).
 
 
 38
 Despite this long-standing precedent, the majority mechanically applies the "solely" test enunciated in Howey, and denies appellants' claims. As support for its test the majority relies on two intervening decisions, United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) and Piambino v. Bailey, 610 F.2d 1306 (5th Cir.1980). In my judgment neither of those cases requires the rule relied upon by the majority, nor do they overrule Koscot.
 
 
 39
 In Forman the Supreme Court faced a claim by members of a low-cost housing cooperative (co-op) that their co-op shares were securities. The Court held against the members, primarily on the ground that there is no expectation of profit in a co-op share. Beginning its analysis of the security issue the Supreme Court restated its "Howey" test, including the "solely" language, but noted the Ninth Circuit's modification of that test, stating: "[w]e express no view, however, as to the holding of [the Turner ] case." 421 U.S. 852, n 16, 95 S.Ct. 2060, n 16. Forman, therefore, did not involve, and does not decide, the "solely" issue.
 
 
 40
 Admittedly, Piambino confuses the issue in stating that Forman "reaffirmed the test first enunciated in Howey, ..." 610 F.2d 1306, 1317. Yet, the Piambino court did not apply a "solely" test. Rather, it restated the investment contract test relying on language in Forman that closely mirrors the Koscot test: "[t]he touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from entrepreneurial or managerial efforts of others." Id. at 1317-18, quoting Forman, 421 U.S. at 852, 95 S.Ct. at 2060 (emphasis added in Piambino ). Further, I am convinced by what the court in Piambino did: it reversed a grant of summary judgment and remanded for a factual determination of whether "reasonable investors did (or did not) believe they were buying into an enterprise whose profits would be determined by Bestline managerial and entrepreneurial methods with no substantial effort by the investor." Id. at 1320. "Solely," allows no help from the investor. Hence, if Piambino stands for the proposition that the "solely" test enunciated in Howey is the law, it is curious the Piambinocourt would have remanded to determine the substantiality of investors' efforts.
 
 
 41
 Koscot is the law. Despite Forman and Piambino this circuit consistently has adhered to the Turner test enunciated in Koscot. The most recent statement of the test appears in Williamson v. Tucker, 645 F.2d 404 (5th Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981), which the Second Circuit considered to support the proposition that the "solely" test is not viable in this circuit. See SEC v. Aqua-Sonic Products Corp., 687 F.2d 577 (2d Cir.1982). See also Martin v. T.V. Tempo, Inc., 628 F.2d 887, 889-90 (5th Cir.1980) (Forman declined to express view on Turner standard; "evidence demonstrates that the agreement fails to meet the Koscot test); United American Bank of Nashville v. Gunter, 620 F.2d 1108, 1116 (5th Cir.1980) (restates "Howey-Forman" test in four parts; "solely" is not a factor, "entrepreneurial or managerial efforts" is). Cf. Gordon v. Terry, 684 F.2d 736, 741-742 (11th Cir.1982) (focus not on sole efforts, but on who has power to control significant decisions).
 
 
 42
 Once the Turner/Koscot test is applied to the facts of this case, it seems apparent that the opposite result obtains. The effort required of the investors in the enterprise at issue is far less than that required in Koscot itself, 497 F.2d at 476. Further, the emphasis in our later cases is not so much on substantiality of the investors' activities as it is on the issue of whose "entrepreneurial" and "managerial" skills are necessary for the venture to succeed. See Williamson v. Tucker, 645 F.2d 404, 423 (5th Cir.1981) (real estate investment partnership; question of whether partners must rely on particular skills of one partner or whether they all hold real control); Martin v. T.V. Tempo, Inc., 628 F.2d 887, 889-91 (5th Cir.1980) (magazine advertisement franchise; plaintiffs undeniably in control of own profits and could succeed as independent entity despite any failure of T.V. Tempo Inc.); Piambino v. Bailey, 610 F.2d 1306, 1318-20 (5th Cir.1980) ("Bestline" distributorship; issue on remand whether investors believed profits would be determined by Bestline managerial and entrepreneurial methods). This conforms to the Supreme Court's and our own mandate in securities cases to disregard form and focus on economic realities, Forman, supra, 421 U.S. at 851-52, 95 S.Ct. at 2060; King v. Winkler, 673 F.2d 342, 344-45 (11th Cir.1982). Logically, the concern is whether the investor believes he is investing in someone else's ability to make a profit, in which case the transaction may be a security, or whether he believes he is investing in his own abilities, in which it may not.
 
 
 43
 Here, the investors answered advertisements that promised "no selling." As the majority opinion describes them their responsibilities were purely "ministerial," Koscot, supra, 497 F.2d at 485, requiring nothing more than visiting the display, counting the number of planters sold, and replacing the sold planters. On the other hand the responsibilities of ABC were those calculated to ensure the venture's success. ABC was responsible for advertising, for providing a unique patented product, for protecting the product's uniqueness, for finding advantageous locations, for protecting those locations, and even for "provid[ing] a 100% return of initial investment" (provided of course that one read the small print). Admittedly, if plaintiffs never visited a sight or collected a cent no money would be made. But, this was true in Koscot, where no money would be made if no prospects were brought to meetings. It was also irrelevant. What was relevant in Koscot, and is determinative here, is that defendant's efforts were those essential managerial and entrepreneurial efforts upon which a profit would be won or lost.
 
 
 44
 ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 
 45
 Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.
 
 BY THE COURT:
 
 46
 A member of this Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc.
 
 
 47
 IT IS ORDERED that the cause shall be reheard by this Court en banc without oral argument on a date thereafter to be fixed. The Clerk will specify a briefing schedule for the filing of en banc briefs.
 
 
 
 [1]
 Although partial summary judgment was granted, since Villeneuve's pendent claims had been previously dismissed, the trial court properly entered final judgment. Thus, jurisdiction exists
 
 
 [2]
 Under the Turner test, an investment contract existed if there was (1) an investment of money (2) in a common enterprise (3) with profits to come from the essential managerial efforts of others
 Since the trial court found against Villeneuve using the essential managerial efforts tests, it is obvious that the trial court would rule the same way using the "solely" test which we again re-affirm.
 
 
 [3]
 Although we rely upon authority from the United States Supreme Court and Piambino v. Bailey from the Fifth Circuit, a split of authority exists in the circuit. Accord, Williamson v. Tucker, 645 F.2d 404 (5th Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). Westchester Corp. v. Peat Marwick Mitchell & Co., 626 F.2d 1212 (5th Cir.1980); Cameron v. Outdoor Resorts of America, Inc., 608 F.2d 187 (5th Cir.1979). Harmonizing these holdings is a job for the en banc court