**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**PHOENIX TELECOM, L.L.C., Jerold Benjamin Clawson, Jerry Deland Beacham and H. Ellis Ragland, Defendants.**

**Civil Action No. 1:00–CV–1970–JTC.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 2, 2000.

James Timothy White, Stites & Harbison, Atlanta, GA, for Movant, Fidelity Nat. Bank.

Larry W. Johnson, Morris, Schneider & Prior, Atlanta, GA, for Movant, Bank United.

Stephen W. Mooney, Smith, Currie & Hancock, Atlanta, GA, for Movant, Communications Management Services, Inc.

James Edgar Long, Edward Gary Sullivan, William P. Hicks, S.E.C., Atlanta, GA, for Plaintiff, S.E.C.

Hayes Michael Dever, Douglas Max Robinson, Friedman, Dever & Merlin, Atlanta, GA, for Defendants, Phoenix Telecom, LLC and Jerold Benjamin Clawson.

James David Dantzler, Jr., McKenna, Long & Aldridge, Atlanta, GA, for Defendants, Jerry Deland Beacham, H. Ellis Ragland, Jr. and Receiver, William G. Hays, Jr.

## ORDER

CAMP, District Judge.

This case is before the Court on Plaintiff Securities and Exchange Commission's Motion for Preliminary Injunction [# 3–1].

### I. PROCEDURAL BACKGROUND

On August 2, 2000, Plaintiff Securities and Exchange Commission ("Commission") filed its Motion for Temporary Restraining Order, Preliminary Injunction and Other Equitable Relief. The Court granted Plaintiff's Motion, entered a temporary restraining order against defendants Phoenix Telecom, L.L.C. ("Phoenix") and Jerold Benjamin Clawson ("Clawson"), appointed a receiver for Phoenix, and froze the assets of all defendants including Jerry Deland Beacham ("Beacham") and H. Ellis Ragland ("Ragland"). The Court set August 9, 2000, as the date for the preliminary injunction hearing.

Rule 52 and specifically Rule 65(d) of the Federal Rules of Civil Procedure require that every injunction shall set forth the reasons for its issuance in specific terms and shall describe in reasonable detail the act or acts sought to be restrained. The Court finds that the Commission has produced sufficient record evidence including the Declaration of Richard P. Murphy and Exhibits 1–29 submitted in conjunction with its application, as well as the evidence produced at the August 9, 2000 preliminary injunction hearing. The following findings of fact and conclusions of law are made by the Court based upon the record before it:

### II. FINDINGS OF FACT

Phoenix was formed as a Georgia limited liability company that, until August 1999, was headquartered in Atlanta, Georgia. (Clawson Dep. p. 8). The three founders of the company, Clawson, Beacham, and Ragland, each took a one-third interest in Phoenix. (Ragland Dep. p. 31). Prior to August 1999, Beacham served as president of Phoenix and Ragland served as vice President of Phoenix. *Id.* at 47–49. In August 1999, Ragland and Beacham were bought out of the company, and Clawson has served as the chief executive officer, sole manager, and principal owner of Phoenix. (Clawson Dep. pp. 12, 30).

Since June 1997, Phoenix has offered investments in customer-owned, coin-operated telephones. Investments are offered and sold in units involving a telephone, site lease, lease/back agreement and buy/back agreement. (Nickerson Dep. pp. 39–40; Clawson Dep. p. 41; Beacham Dep. p. 30). Pursuant to these agreements, investors pay $7,000 to Phoenix for a pay telephone and Phoenix leases the telephone back from the investor for a fixed monthly fee. The investor can, at his option, require Phoenix to repurchase the equipment either at the end of five years or earlier upon 180 days notice. (Ragland Dep. p.

62; Nickerson Dep. p. 48; Decl. of Spainhour pp. PH–002179 and 002188). No registration statement has ever been filed in connection with the securities. (SEC Attestation of Non–Registration).

Phoenix offered and sold its investments to the general public through arrangements with distributors who have sales forces made up largely of licensed insurance agents. (Clawson Dep. p. 34; Distributor Information Web Site: *www.agentdollars.com*). In their marketing efforts, Phoenix, and the distributors used the mails and other jurisdictional means, including three Internet web sites operated by Phoenix and one web site operated by a distributor. (Nickerson Dep. p. 27; Phoenix Web Sites: *www.phoenixpayphone.com; www.agentdollars.com; www.capitalreturn.com*).

Phoenix advertised these investments in sales literature that portrayed Phoenix and its officials as experienced and successful in the telephone industry. The literature noted that Phoenix has "been rewarded with consistent growth as we have made the transition from a local operation to a national firm with equipment and facilities throughout the United States." (Phoenix Sales Page, "Experience the Phoenix Advantage)." However, until March 2000, this sales literature failed to disclose that Phoenix had operated at a loss since 1998 or that it had a negative net worth. (Ragland Dep. pp. 67–68; 1998 and 1999 Phoenix Balance Sheet). One Phoenix brochure stated that Phoenix had owned and operated pay telephones since 1989, when, in fact, Phoenix was formed in June 1997. (Phoenix Sales Page, "Experience the Phoenix Advantage;" Clawson Dep. p. 9; Beacham Dep. p. 8).

Phoenix further advertised on its web sites that investment in Phoenix units was safe, secure, and offered a fixed annual return of 14.1%. (Phoenix Web Site: *www.capitalreturn.com*, p. PH–000286).

These materials further stated that investor's equipment was insured "for 100% of its value," but the materials failed to disclose that, as to the telephone equipment, Phoenix was self-insured, thus providing no security beyond the financial means of Phoenix itself. *Id.*

Another sales brochure, under the caption "Litigation History," represented that

> Over the past seven years neither Phoenix nor any person identified above has been convicted of any administrative, civil or criminal action alleging a violation of any business opportunity law, fraud, embezzlement, fraudulent conversion, restraint of trade, or unfair or deceptive practices, misappropriation of property or comparable allegations and has not been convicted of a felony, or pleaded nolo contenders to a misdemeanor charge or has been liable in civil action by final judgment involving any franchise law, securities law, unfair or deceptive practices, misappropriation of property or comparable allegations. (Decl. of Aguzin p. PH–002339; Beacham Dep. p. 55).

In fact, an injunction had been entered against Ragland in 1994 for violations of Sections 5(a), 5(c), and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b–5 thereunder for operating a ponzi scheme and misappropriating $670,042 for his personal use. *(SEC v. H. Ellis Ragland, Jr.,* Civil Action No. 1:93–CV–2133–JOF (N.D.Ga.)). He received a criminal conviction in state court based on this activity and was ordered to pay restitution of $85,000 in connection with violations of provisions of the Georgia Securities Act. (*State v. H. Ellis Ragland,* Civil Action No. 92–CR–00060–3 (Clayton Superior Ct.)).

Phoenix has never operated at a profit. (Ragland Dep. p. 68). Phoenix's financial statement for December 31, 1999 reflects a

negative net worth of $25,690,626 and an operating loss in 1999 of $19,422,381. (Phoenix Telecom Balance Sheet, December 31, 1999). Until March 2000, investors were not told that Phoenix was losing money, had a negative net worth, or was dependent on revenue from new investors to sustain its operations. (Phoenix Telecom Disclosure Statement—amended as of May 1, 2000).

Clawson, among others, directed the affairs of Phoenix and contracted with distributors to market the investments. (Clawson Dep. pp. 11–12, 25–29, 31). He periodically reviewed and edited the Phoenix web sites, assisted in the creation of sales literature, and knew the true financial condition of the company. (*Id.;* Beacham Dep. p. 25). Finally, Clawson and other principals have taken approximately $6 million out of Phoenix. (1999 Phoenix Disbursement Payments; 1997 and 1998 Phoenix Financial Statements).

## III. CONCLUSIONS OF LAW

█ Under Section 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t(b), and Section 21(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d), the Commission is entitled to a preliminary injunction when it establishes the following: (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated. *See SEC v. Unique Financial Concepts, Inc.,* 196 F.3d 1195, 1199 n. 2 (1999).

### A. Prima Facie Case

█ In order to succeed on the merits of the claim, the Court must first determine whether Defendants have engaged in the offer and sale of "securities" under the terms of the Securities Act and the Securities and Exchange Act. Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), define a "security"

to include an "investment contract." An investment contract is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). The Eleventh Circuit has divided this test into three elements: "(1) an investment of money; (2) a common enterprise; and (3) the expectation of profits to be derived solely from the efforts of others." *Villeneuve v. Advanced Business Concepts Corp.,* 698 F.2d 1121, 1124 (11th Cir.1983), *aff'd en banc* 730 F.2d 1403 (11th Cir. 1984).

### 1. Investment of Money

Defendant's pay telephone program clearly involves an investment of money. Defendant markets the program in its promotional materials as providing a "guaranteed" 14.1% annual return upon investment into the Equipment Lease Program. Charts within the materials specify the "Total Capital Return" investors will make when they purchased one, three, five, or ten units. These charts also compare the "Typical Annual Returns" of the pay telephone program with "Typical Annual Returns" of investments receiving four percent, six percent, and ten percent annual interest.

The language and intent of the program clearly contemplates the investment of money, and the Defendants actively sought individuals to purchase units and invest money into the program. Therefore, the Court finds that the pay telephone program involved an investment of money.

### 2. Common Enterprise

A split currently exists among the circuit courts regarding the definition of a common enterprise. Some circuit courts

hold that a common enterprise is established only by "horizontal commonality," which requires investors to share or pool funds in order to succeed in the venture. *See Stenger v. R.H. Love Galleries,* 741 F.2d 144 (7th Cir.1984); *Newmyer v. Philatelic Leasing, Ltd.,* 888 F.2d 385, 394 (6th Cir.1989). Plaintiffs must demonstrate the "tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak v. SEC Realty Corp.,* 18 F.3d 81, 87 (1994).

On the other hand, "vertical commonality" requires the fortunes of the investor to be "interwoven with and dependent on the efforts and success of those seeking the investment or of third parties." *Villeneuve,* 698 F.2d at 1124. "Vertical commonality" places emphasis on the relationship between the investors and the promoter, not on the relationship between the individual investors. *Unique Financial Concepts,* 196 F.3d at 1199. Furthermore, the thrust of this test is that "the investors have no desire to perform the chores necessary for a return." *Id.* at 1200 (quoting *Eberhardt v. Waters,* 901 F.2d 1578, 1580–81 (11th Cir.1990)).

Because the Eleventh Circuit has adopted the concept of "vertical commonality," the plaintiff must show that the fortunes of individual investors are linked to those of Defendants. Here, investors' fortunes are linked to those of Defendants in that the investors will receive nothing unless Defendants successfully operate the telephones that it leases. In addition, investors' opportunity to sell the phones back to Defendant company at the termination of the lease is dependent upon the financial viability of the company. Because the "vertical commonality" test is satisfied, the Defendant's pay telephone program constitutes a common enterprise.

### 3. Expectation of Profits Derived Solely From the Efforts of Others

The third element of an investment contract requires that investors expect their profits to be derived solely from the efforts of others. *Howey,* 328 U.S. at 301, 66 S.Ct. at 1104. This expectation must be reasonable, and must be derived from the "entrepreneurial or managerial efforts of others." *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975). "[T]he crucial inquiry [for the third prong] is the amount of control that the investors retain under their written agreements." *Albanese v. Florida Nat'l Bank,* 823 F.2d 408, 410 (11th Cir.1987). If investors retain "insubstantial" or "illusory" control, the third element of an investment contract is also satisfied. *Id.* at 412.

In *Albanese,* plaintiffs invested capital in an ice machine leaseback program, purchased an ice machine from a corporation, and leased it back to the corporation for a standard fee. *Id.* The corporation agreed to place the ice machine in various hotels and motels, and contracted to service the machines and collect money from them. The investors signed either a Management Agreement, a Lease Agreement, or an Equipment Lease Agreement with the corporation. *Id.* at 410–11. Under the Lease and Equipment Lease Agreements, the investors retained little, if any, control. However, under the Management Agreement, the investors retained the right to specify the initial placement of the machines. *Id.* at 410.

The Eleventh Circuit concluded that the control retained by the investors was "insubstantial" and "illusory" because (1) the power to specify locations was limited to sites already procured by the corporation, (2) the corporation offered its expertise in finding locations, contracting with hotels, servicing the machines, and accounting for

profits, and (3) the investors had no realistic alternative to allowing the corporation to manage their investments. *Id.* at 412. For these reasons, the Court concluded that profits were derived solely by the efforts of the corporation and, therefore, the third element of an investment contract was satisfied. *See also Unique Financial Concepts,* 196 F.3d at 1201 (concluding that investors had no control over their investments and that profits were derived by defendant corporation under "any reasonable interpretation of 'solely'").

Here, Defendants entered into Equipment Lease Programs in which Defendants agreed to provide pay telephones and equipment, select the sites that telephones would be located, install and maintain the equipment, and retrieve the coins from the telephones. While Defendants argue that investors in the program retained options to cancel their leases with Defendants and self-manage the pay phones, hire a pay phone management company, or enter into a lease with a third party, for all practical purposes these options did not exist. Investors relied on the expertise of the Defendants to select a location and service the phones. Because investors expected profits to be derived from the "entrepreneurial or managerial efforts" of the Defendants, the third element of an investment contract is satisfied.

### 4. Violations

■ The pay phone program offered by the Defendants is an investment contract and is, therefore, governed by the Securities and Exchange Acts. Section 5(a) of the Securities Act makes it unlawful for any person to use any means or instruments of transportation or communication in interstate commerce or of the mails to sell a security for which a registration statement is not in effect. Section 5(c) similarly makes it unlawful to offer to sell a security for which a registration statement has not

been filed. From at least June 1997, Defendants sold securities to numerous persons throughout the United States by using the mails and other forms of media, including Internet web sites. No registration statement has been filed with the Commission in connection with these sales. These activities constitute a *prima facie* violation of Sections 5(a) and 5(c). *SEC v. Continental Tobacco Co.,* 463 F.2d 137, 155 (5th Cir.1972).

■ Furthermore, Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, proscribe fraudulent conduct in connection with the offer, purchase and sale of securities. To establish a violation of these provisions, the Commission must show that Defendants (a) used jurisdictional means, (b) engaged in fraudulent schemes, practices or courses of business or made materially false or misleading statements, (c) in connection with the offer or sale of securities, and (d) for violations of Section 17(a)(1) and 10(b), acted with scienter. *Steadman v. SEC,* 603 F.2d 1126, 1131–33 (5th Cir.1979), *aff'd,* 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981).

Here, Defendants used the mails (to send promotional sales materials to investors) and instrumentalities of interstate commerce (e.g., an Internet web site to provide sales materials). Such activity satisfies the jurisdictional means requirement. *See Glick v. Campagna,* 613 F.2d 31, 35–36 (3d Cir.1979).

Defendants marketed the Phoenix lease program using statements including misrepresentations and omissions concerning: (1) the losses experienced by Phoenix from operations and its resultant negative net worth; (2) the regulatory history of persons affiliated with Phoenix; (3) the investor's security interest in aligned telephone equipment; and (4) the purported insurance on assigned equipment and its effect

on the safety of the Phoenix investment. Such representations and omissions, going to the essence of the investment decision, are clearly material under the antifraud provisions of the federal securities laws in that disclosure of the true facts would have been viewed by investors as significantly altering the "total mix" of information available to them. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

Finally, the Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In the Eleventh Circuit, scienter may be shown by "severe recklessness," defined as "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *McDonald v. Alan Bush Brokerage Company*, 863 F.2d 809, 814 (11th Cir.1989).

The misrepresentations and omissions made by the proposed defendants were made with scienter. Each of the Defendants, and Phoenix through them, was aware of the financial condition of Phoenix and the fact that Phoenix was the only source of insurance on the investments. Despite that knowledge, they marketed the Phoenix program as a safe, insured investment. Further, Ragland knew of his own securities law injunction and related criminal conviction and nevertheless prepared sales materials touting the clean record of Phoenix's officers without disclosing his true history. Because they were each aware of the misleading nature of the sales materials and the web site, they acted with the requisite scienter.

**B. Reasonable Likelihood that the Wrong Will Be Repeated**

Before the Court may issue a preliminary injunction, the Commission must establish by a preponderance of the evidence that there is "reasonable likelihood that the Defendants are engaged or are about to engage in practices that violate federal securities law." *SEC v. Int'l Heritage, Inc.*, 4 F.Supp.2d 1368, 1372 (N.D.Ga.1998)(Story, R)(citing *SEC v. First Financial Group of Texas*, 645 F.2d 429 (5th Cir.1981)). "The Commission may make such a showing by submitting proof of past substantive violations that indicate a reasonable likelihood of future substantive violations." *Id.* In granting or denying relief, the Court considers, among other things, the "egregiousness of the defendant's actions" and the "isolated or recurrent nature of the infraction." *Id.*

Consideration of these factors supports a preliminary injunction against Phoenix and Clawson, based on violations of Sections 5(a), 5(c) and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b–5 thereunder. Defendants conduct was egregious, systematic, and continuous for a number of years. With respect to Clawson and Phoenix, it is recent and may be ongoing. While Defendant's contend that Phoenix was recently purchased by ETS Management Services, it appears that both Phoenix and Clawson remain liable for a number of existing investor contracts. Furthermore, Clawson could potentially receive a percentage of the profits that ETS Management Services will receive if Phoenix investors sign ETS Management leases.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction [# 3–1] is **GRANTED**.

*Preliminary Injunction*

## I.

IT IS HEREBY ORDERED that, until further order of this Court, defendants Phoenix and Clawson as well as their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this order by personal service facsimile transmission or otherwise, and each of them, be and hereby are, until further order of this Court, enjoined and restrained from violating Section 17(a) of the Securities Act of 1933, 15 U.S.C. 77q(a), by, directly, or indirectly, through the use of any means or instrument of transportation and communication in interstate commerce, or of the mails,

a. employing any device, scheme, or artifice to defraud;

b. obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c. engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser, in the offer or sale of any security.

## II.

IT IS FURTHER ORDERED that, until further order of this Court, defendants Phoenix and Clawson as well as their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who will receive actual notice of this order by personal service, facsimile transmission or otherwise, and each of them, be and hereby are enjoined and restrained from violating Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), and Rule 10b–5, 17 C.F.R. 240.10b–5, promulgated thereunder by, directly or indirectly, through the use of any means or instrumentalities of interstate commerce, or of the mails or of any facility of a national securities exchange,

a. employing any device, scheme, or artifice to defraud;

b. making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c. engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

## III.

IT IS FURTHER ORDERED that, until further order of this Court, defendants Phoenix and Clawson and their agents, servants, employees, attorneys and those persons in active concert or participation with them, who receive actual notice of the order of injunction, by personal service, facsimile or otherwise, and each of them, by use of the mails or any means or instrumentality of interstate commerce, are restrained from directly or indirectly:

(a) making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, in the form of common stock or any other security, through the use or medium of any prospectus or otherwise, unless and until registration statement is in effect with the Commission as to such securities;

(b) carrying securities, or causing them to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale, unless and until

a registration statement is in effect with the Commission as to securities;

(c) making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of any prospectus or otherwise, any interest in securities, in the form of common stock or any other security; unless a registration statement is filed with the Commission as to such securities, or while a registration statement filed with the Commission as to such security is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 8 of the Securities Act. [15 U.S.C. 77h]; in violation of section 5 of the Securities Act. [15 U.S.C. 77e].

## IV.

IT IS FURTHER ORDERED that, pending final determination as to all of the parties to this action, defendants Phoenix, Clawson, Beacham and Ragland as well as their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this order by personal service, facsimile transmission or otherwise, and each of them, are hereby enjoined from destroying, mutilating, concealing, altering, or disposing of any document referring or relating in any manner to any defendants herein including but not limited to (a) any investor investments in Phoenix and (b) records evidencing the receipt and disbursal of investor funds of Phoenix. As used in this order, "document" means the original and all non-identical copies (whether non-identical because of handwritten notation or otherwise) and all written or graphic matter, however produced, and any other tangible record, or electronic data compilation of any sort, including, without limitation, computer disks, computer hard-drives, computer diskettes, computer tapes, correspondence, memoranda, notes, minutes, telephone records, reports, studies, telexes, diaries, calendar entries, contracts, and letters of agreement, and including any and all existing drafts of all documents.

## V.

IT IS FURTHER ORDERED that this Order does not preclude the Commission from seeking a permanent injunction, an accounting, disgorgement and prejudgment interest and the imposition of civil penalties, or any other relief, in this action. Except as otherwise provided by order of the Court, the freeze of assets as set forth in the Court's order of August 2, 2000 shall remain in effect. The Court's order appointing Bill Hays as Receiver for Phoenix shall remain in full force and effect until further order of this Court.

## VI.

IT IS FURTHER ORDERED that defendants Phoenix and Clawson prepare and present to the Court and to the Commission an accounting of all funds received pursuant to the activities described in the Commission's complaint and of the disposition and use of said proceeds. This accounting shall include, but not be limited to, the name and address of each investor, the amount invested, the total amount received from each investor and a listing of all expenditures showing the amount, to whom paid, purpose of the payment and the date of payment and the date of payment and the location of existing investor funds. This accounting shall be submitted to the Court and served on the Commission within 30 days from the date of the entry of this Order.

## VII.

IT IS FURTHER ORDERED that the Defendants are to undertake immediately

all necessary actions to repatriate any investor funds which they transferred or caused to be transferred outside the country.

### VIII.

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for the purpose of enforcing this Order.